**UNITED STATES of America,**

v.

**Alberto BRAVO et al., Defendants.**

**No. 75 Cr. 429 (JMC).**

United States District Court,
S. D. New York.

Oct. 31, 1975.

---

Paul J. Curran, U. S. Atty. for the Southern District of New York by Michael Q. Carey and Peter M. Bloch, Asst. U. S. Attys., New York City, for the United States.

Murray Cutler, Brooklyn, N. Y., for defendant Carmen Gill.

Kassner & Detsky, Herbert S. Kassner, New York City, for defendant Libardo Gill.

MEMORANDUM

CANNELLA, District Judge:

The motion of defendants Carmen and Libardo Gill to suppress certain evidence seized on September 30, 1974 from their apartment at 580 Amsterdam Avenue in the Borough of Manhattan is hereby denied.

FACTS

Based upon the evidence adduced at a hearing held on October 16 and 17, 1975, the Court finds the underlying facts to be as follows.

During the investigation into the death of one Luis Ramos, the telephone number and address of Apartment 3D at 580 Amsterdam Avenue came to the attention of the Manhattan Homicide Task Force of the New York City Police Department. Sergeant Gerald McQueen, Commanding Officer of the Task Force, and Detective Richard Powers visited the apartment at approximately 2:30 P.M. on September 30, 1974. Their purpose was to interview the residents of the apartment about the homicide.[1] Det. Powers, with Sgt. McQueen standing behind him, knocked on the door. After hearing a noise which sounded to him as if the "peephole" in the door was being opened, Powers announced his identity and held his New York City Police Department Detective's shield in the direction of the peephole. Shortly, thereafter, the door opened approximately six or eight inches, at which time the police officers observed a male, who was later identified as Libardo Gill,[2] standing in the doorway. Det. Powers again identified himself, continued to hold up his shield and requested that the officers be allowed to enter the apartment to speak with Mr. Gill. At the same time, he pointed towards the interior of the apartment, indicating that the officers would like to come in. Mr. Gill then stepped back as he opened the door completely and the police officers walked past him a few feet into the apartment. Mr. Gill closed the door behind them. Upon entering the apartment, Det. Powers and Sgt. McQueen found themselves in the living room.

The officers began to question Mr. Gill and soon thereafter their attention was drawn to a female, later identified as Carmen Gill,[3] Mr. Gill's wife. She was seated in the living room at a table located approximately four feet from the officers. On the table was some United States currency in the form of bills, two cigarette butts between one and one-half inches long, an ashtray and some miscellaneous papers. The officers testified that the cigarettes appeared to be home-rolled, as they were thinner than manufactured brands and not as round. Although each of the cigarettes had at one time been burning, neither was lit when the police officers noticed them. Both Det. Powers and Sgt. McQueen concluded that the butts were "roaches", the remaining portions of partially smoked marijuana cigarettes. They reached this conclusion because the butts were on the table near the ashtray and apparently were being preserved, although through visual inspection it could not be determined whether the butts were actually composed of marijuana, as opposed to some other substance, such as tobacco.

Pointing to what he had concluded were marijuana cigarettes, Det. Powers asked the Gills, "Whose cigarettes are these?", at which time they both shook their heads from side to side and raised their arms, holding their palms upright, in a fashion indicating that they did not

---

1. Defendants claim that the homicide investigation was not the true purpose of the visit, but was merely a ruse to gain entrance to the Gill apartment. The Court finds, however, that no such subterfuge was involved and that Officers Powers and McQueen were in fact investigating the death of Luis Ramos.

2. Libardo Gill is also known as Ramiro Estrada, and was referred to by both names during the proceedings herein.

3. Mrs. Gill was also referred to as Carmen Estrada.

know the answer to that question.[4] Without any further inspection of the alleged marijuana cigarettes or questioning of the Gills, Det. Powers placed them under arrest.

Det. Powers then proceeded to walk through the apartment to determine whether anyone else was present, even though neither he nor Sgt. McQueen had any reason to believe that there, in fact, was anyone else in the apartment at that time. While walking down the hallway which connected the living room with the kitchen, bathroom and bedroom,[5] Det. Powers noticed two shopping bags just inside and to the left of the doorway to the kitchen. Sticking out of one of these bags were two or three bricks which Det. Powers concluded were made of marijuana. Inside the kitchen and to the right of the doorway was an open brown leather bag; by looking directly down into the bags not containing the "marijuana" bricks, Det. Powers could see what appeared to be loose marijuana in one and plastic bags containing a white powder in the other. He called all three bags to the attention of Sgt. McQueen and continued to look through the apartment for other persons.

His attention having been drawn to the bags, Sgt. McQueen walked into the kitchen and glanced down into them, also noticing the bricks and a bag of white powder. However, nothing was removed from the bags nor were they disturbed in any other manner.

Shortly thereafter, Det. Powers returned from his inspection of the premises and Sgt. McQueen instructed him to watch the two defendants. Sgt. McQueen went to the bedroom and placed a telephone call to the narcotics division of the police department. At this point, Carmen Gill pointed to the money that was on the kitchen table and moved her

hand and arm downwards along her body as if to indicate that Det. Powers should put the money into his pocket.[6] Det. Powers then asked Mrs. Gill why he should do that and she indicated to him, again by the use of sign language (pointing to Det. Powers, her husband and herself, then to the window and slapping her hands together), that it was to enable the Gills to escape. Det. Powers replied, "No, not enough, too small," and indicated the same by holding his thumb and index finger approximately one-half of an inch apart. Carmen Gill responded that she had more money and held her hands approximately six inches apart. Det. Powers asked her where, and she got up and began walking towards the large closet in the hallway. Powers followed her to the closet and, when she reached up in order to remove a shoe box from the shelf, he requested that she stop. She did stop—and Det. Powers removed the box from the closet and opened it himself, revealing a large sum of money. Mrs. Gill then indicated that she wanted to give Det. Powers and Sgt. McQueen two thousand dollars ($2,000). Det. Powers again responded that the offer was insufficient, and after a conversation about his family, was given the additional sum of one thousand dollars ($1,000) by the female defendant. She suggested that he buy his children something with the money and said, "Don't tell the other men," indicating this by putting her index finger over her lips.

At some point between the original offer of money and the removal of the shoe box from the closet, Sgt. McQueen returned from the bedroom, where he had been using the telephone, and was informed of the "bribe" offer. He then returned to the bedroom to place additional calls, including one to his boss and one to the Internal Affairs Division,

---

4. Although neither Carmen nor Libardo Gill could speak or understand more than rudimentary English, they were able to communicate with the police officers.

5. *See* Appendix for a diagram and a more detailed description of the defendants' apartment.

6. Libardo Gill observed and acquiesced in this and all further activities of his wife.

whose responsibility it was to investigate police corruption.

Eventually, a Detective George Pagan of the Manhattan Robbery Squad and one Sergeant Nesbitt of the Internal Affairs Division arrived at the apartment. Det. Pagan could speak and understand Spanish and proceeded to converse with the instant defendants in that language. Subsequently, each of the four officers in the apartment was given the sum of five thousand dollars ($5,000) (in addition to the one thousand dollars ($1,000) already given to Det. Powers), and Det. Powers was dispatched to procure a search warrant. This was at approximately 4:00 P.M. At approximately 7:00 P.M. he returned with the warrant.[7]

What transpired between Det. Powers' departure and his return is unclear, but it is certain that there was no search of any cabinets, drawers or closets (other than the one from which the shoe box was removed) in the apartment prior to the execution of the search warrant.

After Det. Powers returned with the warrant, it was shown to both defendants and explained to them by Det. Pagan. At or about that time, the defendants were again placed under arrest, this time on a bribery charge, and were finally given a *Miranda* warning by Det. Pagan. Pursuant to the warrant, the premises were searched.[8] Except for the three partially smoked marijuana cigarettes found on the table in the living room and on the hallway icebox, all of the marijuana and cocaine eventually seized from the apartment was located in the three bags found in the kitchen.

The search was completed between 7:00 and 9:00 P.M. on the evening of September 30, 1974, when the officers left the apartment with the defendants and in possession of the seized items.

## THE INITIAL ENTRY

■ The Court's inquiry into the admissibility of the instant evidence must begin with the initial entry into the Gills' apartment, as counsel for defend-

7. The issuance of the search warrant was based upon the following affidavit sworn to by Det. Powers:

1. I am a Detective in the Police Department of the City of New York assigned to the Manhattan Homicide Task Force.

Since July 28, 1974, I have been investigating the death of one, Luis Rios which occurred at 6:45 a. m. in premises 305 West End Avenue, State and County of New York. This case is carried under U.F. 61 *8328 of the 20th Precinct.

As a result of information received, I in company of Sgt. Gerald McQueen went to apartment 3D in premises 580 Amsterdam Avenue, New York County on this date. After I knocked on the door it was opened by Libardo Gill. After identifying ourselves as police officers, Mr. Gill admitted us to the apartment. Present in the apartment at that time was one, Carmen Gill. Upon entering I observed on a table what appeared to be a quantity of marijuana and a sum of money. Both Libardo and Carmen Gill were then placed under arrest and charged with possession of marijuana.

Carmen Gill then offered a sum of money to myself and Sgt. Gerald McQueen as a bribe not to make the arrest. During the bribe offer, I conducted a security check of

the apartment, for other persons/or other contraband. In the kitchen of the apartment, I noticed on the floor thereat three open shopping bags. Two of these shopping bags contained what appeared to be marijuana. The third shopping bag contained a quantity of white powder which I believe to be heroin or cocaine. None of these shopping bags have been touched, searched or removed from the kitchen of the aforementioned apartment pending the issuance of a search warrant if the Court finds probable cause to issue.

8. The following items were seized during the search:

1. $71,617.00 US Currency
2. 19 Plastic bags alleged Marijuana
3. 5 Plastic bags alleged cocaine
4. 1 Zephyr Scale
5. 2 Strainers with residue
6. 3 Rolls plastic tape
7. 8 Boxes plastic bags
8. 1 Box aluminum foil
9. 3 Partially smoked alleged marijuana Cigarettes
10. 2 Passports, Columbia S. A.
11. 1 Sealed papers misc. papers
12. 1 Sanyo Electronic Calculator Serial #86002934
13. 4 Safe Deposit keys.

**302**

ants contend that permission to enter was induced by a claim of lawful authority to do so. We find, however, that the facts do not support this assertion. There was no show of force by the officers nor did they demand entry in any manner whatsoever. When Det. Powers identified himself and Sgt. McQueen as police officers, and displayed his badge, Libardo Gill freely and voluntarily allowed them to enter his apartment. The Court is convinced that under the circumstances the entry into the Gills' apartment was made with the consent of the occupants, and hence, was lawful. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

### THE ARREST

■ Once the officers were lawfully in the living room of the apartment, they noticed Carmen Gill sitting at a table. Looking in her direction, Det. Powers and Sgt. McQueen observed the two cigarette butts which were later to form the basis of the defendants' arrest. The butts were lying on the table in full view of anyone within eyesight of it. The butts were not discovered during the course of a search but were inadvertently seen by law enforcement officers during the lawful execution of their duties. In sum, the butts were found in "plain view". *See Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Ker v. California,* 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

Although the officers did not inspect the butts more thoroughly than a visual examination permitted, each came to the independent conclusion that they contained marijuana. As both of the officers were experienced in this area

(Sgt. McQueen through his position as a supervisor in the narcotics division of the police department during 1969 and 1970, and Det. Powers by reason of his having effected numerous arrests for possession of marijuana cigarettes, in addition to his attendance of courses on such drugs), the Court accepts their judgment and finds that they had first hand knowledge of sufficient facts and circumstances to warrant a man of reasonable caution in the belief that a crime was being or had been committed. *Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United States v. Wingate,* 520 F.2d 309 (2d Cir. 1975). Accordingly, the arrest of the defendants was supported by probable cause.

### THE FIRST SEARCH

■ Having effectuated a lawful arrest in the living room of the Gill residence, Det. Powers proceeded to search the entire apartment, discovering additional incriminating evidence. There can be no doubt that this search exceeded in scope the permissible bounds of a search which is justified as incident to a lawful arrest. "For the routine search of rooms other than that in which the arrest occurs, 'absent well recognized exceptions' a search warrant is required." *United States v. Melville,* 309 F.Supp. 829, 831 (S.D.N.Y.1970) (citations omitted); *see Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969).

It is the Government's position that a cursory inspection of the premises during the course of this arrest was necessary to determine whether other persons who might thwart the arrest, present a threat to Det. Powers and Sgt. McQueen or escape the premises were present. Although there are circumstances which justify law enforcement personnel in conducting such a search concurrent with an arrest,[9] no such cir-

9. *See, e. g., United States v. Rich,* 518 F.2d 980 (8th Cir. 1975) (three automobiles were parked outside of farmhouse, but only two persons were found asleep in the living room); *United States v. Smith,* 515 F.2d

1028 (5th Cir. 1975) (arresting agents had information that appellant was armed and accompanied by at least one other person); *United States v. Looney,* 481 F.2d 31 (5th Cir.), *cert. denied,* 414 U.S. 1070, 94 S.Ct.

cumstances were present here. The officers involved were interviewing the occupants of an apartment whose address had come to their attention during the investigation of a homicide unrelated to the marijuana arrest. Approximately fifty such interviews had been conducted pursuant to similar leads and the officers did not believe that any person or persons involved in the homicide would be found in this particular apartment, nor did they feel that its occupants were dangerous. Moreover, the arrest they made was for possession of two marijuana cigarettes, a relatively minor drug offense. Most importantly, however, neither Det. Powers nor Sgt. McQueen had knowledge of any facts which would indicate that there were others in the apartment or that they themselves were in danger. The only justification advanced for the investigation was the departmental practice of searching all rooms of a residence for other persons upon completion of an arrest. This is not sufficient justification of the instant search. Where no circumstances exist indicating that there may be, concealed in an apartment, persons who might present a danger to police officials, the fourth amendment does not allow a search such as the one conducted herein. *See Chimel, supra.*

## THE SECOND SEARCH

■ Had Det. Powers and Sgt. McQueen seized the marijuana and cocaine contained in the bags in the kitchen upon their initial discovery, it may very well be that we would be constrained to suppress their use at trial. However, as the evidence remained untouched while Det. Powers proceeded to procure a search warrant, our inquiry does not end with the determination that the first search

was unlawful. For even though the affidavit underlying the search warrant contained allegations based on evidence illegally obtained during the first search, the warrant, and therefore the search conducted pursuant to it, is valid it if is based on evidence from independent sources sufficient to justify its issuance. *United States v. Koonce,* 485 F.2d 374, 379 (8th Cir. 1973); *United States v. Tarrant,* 460 F.2d 701, 703–04 (5th Cir. 1972); *Howell v. Cupp,* 427 F.2d 36, 38 (9th Cir. 1970); *United States v. Sterling,* 369 F.2d 799, 802 (3d Cir. 1966).

> [T]he inclusion in an affidavit of indisputably tainted allegations does not necessarily render the resulting warrant invalid. The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.

*United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed. 2d 341 (1974) (Powell, J., concurring in part and dissenting in part); *accord, United States v. Epstein,* 240 F.Supp. 80 (S.D.N.Y.1965).

■ The Court finds that the affidavit, without consideration of the tainted evidence, contained ample ground for issuance of the search warrant. The information which came to Det. Powers' attention in the lawful performance of his duties, namely, the "quantity of marijuana" and "sum of money" observed on the table coupled with the bribe offered to the officers not to make the arrest, pro-

---

581, 38 L.Ed.2d 476 (1973) (arrest took place at 2:15 a. m. in an unfamiliar house located in a rural area; the arrestee had a known propensity for using confederates, and was being arrested for the heinous crime of soliciting the assassination of a federal judge); *United States v. Johnson,* 467 F.2d 630 (2d Cir. 1972), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3069, 35 L.Ed.2d 595 (1973) (hot pursuit of an armed felon); *United States*

*v. Pino,* 431 F.2d 1043 (2d Cir. 1970), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1675, 29 L.Ed. 2d 154 (1971) (search imperative where heroin is known to be concealed on premises and search warrant is not immediately procurable); *United States v. Melville,* 309 F. Supp. 829 (S.D.N.Y.1970) (search for explosives and explosive devices which were believed to present an immediate public hazard).

vided Justice Roberts with a substantial basis for the conclusion that other contraband was probably present in the apartment.

As a last resort, defendants contend that even the evidence of the bribe offer was tainted; firstly, because it occurred before the defendants were given a *Miranda* warning, and secondly, because the actual discovery of the money involved in the bribe was the result of yet another unlawful search. The Court finds no merit in either of these arguments.

■■ The tender of money to Det. Powers by Carmen Gill, which the detective interpreted as a bribe, was voluntary and spontaneous and not the result of any physical or psychological coercion. The officers in no way elicited the statement or hand motions which constituted what Det. Powers characterized as a bribe offer. Such voluntary statements, "not in response to custodial interrogation, are not barred by the fifth amendment, nor has their admissibility been affected by the *Miranda* decision or its progeny." *United States v. Martin,* 511 F.2d 148, 151 (8th Cir. 1975). *See also, United States v. Hopkins,* 486 F.2d 360 (9th Cir. 1973); *United States v. Sanchez,* 449 F.2d 204, 209 (5th Cir. 1971), *cert. denied,* 405 U.S. 925, 92 S.Ct. 973, 30 L.Ed.2d 798 (1972). Furthermore, there is no requirement that the defendant be interrupted during a spontaneously volunteered statement and given a *Miranda* warning. *United States v. Gaynor,* 472 F.2d 899, 900 (2d Cir. 1973); *United States v. Garcia,* 377 F.2d 321, 324 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967).

This conclusion is supported by the recent Second Circuit decision in *United States v. Gentile,* 525 F.2d 252 (2d Cir. 1975). The court of appeals therein stated that "[a] failure to give *Miranda* warnings . . . even in a custodial setting, would not prevent a prosecution for an attempt to bribe a law enforcement officer made subsequent to [an] arrest." *United States v. Gentile, supra,* at 259. See also, *United States v. Perdiz,*

256 F.Supp. 805 (S.D.N.Y.1966). If the purpose of the *Miranda* decision, "to prevent abusive police interrogation of persons not aware of their right to remain silent," does not extend to the use of a bribe offer in a later prosecution for that crime, *United States v. Gentile, supra,* at 259; *United States v. Perdiz, supra,* this Court can see no reason for extending it to preclude the use of a bribe offer in a collateral proceeding, such as one for the issuance of a search warrant.

■ The Court's response to defendants' latter contention is equally straightforward. The shoe box full of money which was in the hall closet was not obtained as the result of an illegal search. The uncontroverted evidence shows that defendant Carmen Gill freely and voluntarily led Det. Powers to the place where the box was located and, similarly, permitted him to remove the box from the closet and look into it. Under the circumstances involved, this search, if in fact it was a search, was conducted with consent and did not result in the illegal acquisition of evidence by the Government. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Miley,* 513 F.2d 1191 (2d Cir. 1975).

### MISSTATEMENT IN AFFIDAVIT

■ It is apparent that Det. Powers' affidavit in support of the instant search warrant contains a misstatement. It alleges that the security check of the apartment took place during the bribe offer, while the testimony at the suppression hearing clearly indicates that the bribe occurred after the completion of that operation. However, it is equally clear that this misstatement was neither knowingly nor recklessly made. Det. Powers was at most, negligent in his mistaken account of the exact sequence of events surrounding the bribe offer. In any event, the statement was not material. The timing of the bribe offer herein has no relevance to the existence of probable cause to search. That the offer

was in fact made, an occurrence of which we have no doubt, is the crucial issue. The Court therefore finds the misstatement insufficient to affect the validity of the search warrant. *See United States v. Pond,* 523 F.2d 210 (2d Cir. 1975); *United States v. Carmichael,* 489 F.2d 983, 989 (7th Cir. 1973) (en banc); *United States v. Gonzalez,* 488 F.2d 833 (2d Cir. 1973).

## CONCLUSION

In sum, the Court finds that all of the evidence seized from the residence of Carmen and Libardo Gill on September 30, 1974 was lawfully acquired by the Government.

## APPENDIX

A – Door to the apartment
B – Table
C – Kitchen
D – Hallway
E – Closet (from which shoe box was taken)
F – Bathroom
G – Living Room
H – Bedroom

I – Position of Carmen Gill when the officers entered the apartment
J – Position of Libardo Gill when he was placed under arrest
K – Position of Detective Powers when he first observed the bags located in the kitchen
L – The two shopping bags
M – The brown leather bag