### UNITED STATES of America
### v.
### Rev. Alberto MEJIAS et al., Defendants.
### No. 76 Cr. 164.

United States District Court,
S. D. New York.

June 21, 1976.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., by Michael Q. Carey, Nathaniel H. Akerman, Asst. U. S. Attys., New York City, for the U. S.

John A. Ciampa, New York City, for defendant Rev. Alberto Mejias.

Stokamer & Epstein, by Michael Stokamer, New York City, for defendant Mario Navas.

Howard Jacobs, Donald Nawi, New York City, for defendant Estella Navas.

Stuart R. Shaw, New York City, for defendant Henry Cifuentes-Rojas.

Abraham Solomon, New York City, for defendant Jose Ramirez-Rivera.

Federal Defender Services Unit by Jack Lipson, New York City, for defendant Manuel Francisco Padilla Martinez.

Herbert Olan Brown, Brooklyn, N. Y., for defendant Francisco Cadena.

Jerome Allan Landau, New York City, for defendant Alba Luz Valenzuela.

## OPINION

ROBERT L. CARTER, District Judge.

Defendants Manuel Francisco Padilla Martinez ("Padilla Martinez")[1] and Estella Navas ("Navas") have moved to dismiss the indictment against them on the grounds that they have been denied a speedy trial in violation of the Sixth Amendment of the United States Constitution, Rule 48(b), F.R. Crim.P., and the District Court's Interim Plan Pursuant to the Provisions of the Speedy Trial Act of 1974.

In the alternative, the moving defendants seek a dismissal of the indictments against them on the grounds of pre-indictment delay, in violation of the Fifth Amendment to the United States Constitution.[2] The motions are denied.

*Facts*

On September 3, 1974, defendants Padilla Martinez, Mejias, Cadena and Valenzuela were arrested by New York City Police in apartment 1B at 455 West 48th Street in New York City and were charged with various violations of New York State drug laws. Special Agents of the Drug Enforcement Administration of the Department of Justice ("DEA") were present at the time of the arrest.

On the same day, defendant Rojas was arrested at the corner of 8th Avenue and 30th Street in New York City by a New York City Police Officer, for violations of New York State drug laws. A special agent of the DEA was present at the time of the arrest.

On October 4, 1974, defendant Navas was arrested for violations of state drug laws by the New York City Police in apartment B–204 at 61–20 Grand Central Parkway, Queens, New York. Special Agents of the DEA were present at the time of the arrest.

The decision to make all these arrests was made by a Lieutenant O'Shea of the New York City Police Department and the arrests were authorized by Assistant District Attorney Lawrence Herrmann. All federal agents participating in the arrests were under the command of Lieutenant O'Shea; no federal agent made any arrests, seized any evidence or detained any defendant. Indeed, no defendant was served with a federal summons and no federal charges were lodged until the filing of the instant indictment. Each of the above named defendants was subsequently indicted by the State of New York for various violations of state drug laws.

1. Defendant Padilla Martinez has asked that he be referred to at trial as Francisco Padilla.

2. Defendants Francisco Cadena ("Cadena"), Rev. Alberto Mejias ("Mejias"), Alba Luz Valenzuela ("Valenzuela") and Henry Cifuentes-Rojas ("Rojas") have joined in the motion of defendant Padilla Martinez. Defendant Cadena has been referred to at trial as Francisco Salazar. Defendant Rojas has been referred to as Juan Jose Plata. In addition, I have permitted Mario (Evangelista) Navas and Jose Ramirez-Rivera to join in the motion of the defendants. Defendant Ramirez-Rivera has been referred to at trial as Jose Ramirez.

On October 4, 1974, Indictment 74 Cr. 939 was filed in the United States District Court for the Southern District of New York. The indictment named twenty-nine individuals as defendants. It also identified as co-conspirators, among others, the Rev. Alberto Mejias, Mario (Evangelista) Navas, Estella Navas and Juan Mesa.

On April 30, 1975, Indictment 74 Cr. 939, among others, was superseded by the filing of Indictment S 75 Cr. 429. This superseding indictment named thirty-eight persons as defendants and identified as co-conspirators either in the indictment itself or in the government's bill of particulars, approximately 400 persons, including the defendants in this case.

The trial of Indictment S 75 Cr. 429, *United States v. Alberto Bravo,* D.C., 403 F.Supp. 297, commenced before the Honorable John M. Cannella, United States District Judge and a jury on October 20, 1975. It ended approximately fourteen weeks later, on January 23, 1976, with a jury verdict of guilty as to the twelve defendants on trial.

On February 19, 1976, the indictment in this case, 76 Cr. 164, was filed in the Southern District of New York. Defendants Padilla Martinez and Navas are charged in the indictment with one count of conspiracy to distribute and possess with the intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 963. In addition, defendant Navas is charged in Count Three of the indictment with distributing and possessing with the intent to distribute approximately one pound of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2.

The investigation by the government and the grand jury preceding the filing of the indictment did not commence until after the conclusion of the *Alberto Bravo* trial on January 23, 1976. The investigation was begun because the government had been informed by the New York State authorities that the various state prosecutions against the defendants in this action were severely jeopardized by the loss of a suppression motion in state court.[3]

The federal investigation covered a period beginning in January, 1972—one and one half years earlier than the earliest date in any state charge against the defendants named in the instant indictment. Furthermore, the federal indictment identifies far more individuals than were named in the various state indictments, and was based on evidence which had come into the government's possession from the State in preparation for the *Alberto Bravo* trial, as well as on evidence developed solely by federal agents.[4]

---

**3.** On September 24, 1975, Judge Liston Coon of the New York State Supreme Court, New York County, granted a motion by the defendants arrested at 455 W. 48th Street to suppress evidence seized at that address pursuant to a search warrant. *People v. Salazar,* 83 Misc.2d 922, 373 N.Y.S.2d 295 (Sup.Ct.1975). The state indictments are still pending.

**4.** The evidence seized at the time of the arrests of the defendants was never forwarded by the New York City Police Department to the federal government. Part of this evidence was subpoenaed on September 3, 1975, by the United States District Court on behalf of the United States Attorney for the Southern District of New York for use in the Alberto Bravo trial. Part of the evidence was delivered to the government on January 29, 1976, in contemplation of the trial in the instant case, *United States v. Rev. Alberto Mejias, et al.*

Furthermore, copies of original wiretap recordings and certain transcripts or summaries of transcripts were provided to the government not later than January, 1975, for use in preparing for the Alberto Bravo trial. The wiretap comprised approximately 7,000 conversations in Spanish recorded in the nine months from January, 1974 to October, 1974. It would appear that such transcripts were available to the government since they formed the evidentiary foundation for various state wiretap applications which were made subsequently. In any event, however, the government contends it did not receive them. Furthermore, the government hired its own interpreters to prepare official transcripts for use in the Alberto Bravo trial since the state transcripts had not been prepared by professional interpreters. Between January and October, 1975, some 350 conversations were transcribed out of the 7,000 wiretapped conversations. Of these, approximately 175 were used at the Alberto Bravo trial.

*Discussion*

*Right to a Speedy Trial*

I

The moving defendants first argue that they have been denied a speedy trial as guaranteed by the District Court's Interim Plan Pursuant to the Provisions of the Speedy Trial Act of 1974 ("Interim Plan"). The rule on which the defendants rely, Rule 5 of the Interim Plan, provides as follows:

"In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, and if the defendant is charged only with non-capital offenses, the defendant may move in writing, on at least ten days' notice to the government, for dismissal of the indictment. Any such motion shall be decided with utmost promptness. If it should appear that sufficient grounds existed for tolling any portion of the six-months period under one or more of the exceptions in Rule 6, the motion shall be denied, whether or not the government has previously requested a continuance. Otherwise the court shall enter an order dismissing the indictment with prejudice unless the court finds that the government's neglect is excusable, in which event the dismissal shall not be effective if the government is ready to proceed to trial within ten days."

Defendants argue that their speedy trial rights crystallized at the time of their initial arrests on state charges, (i. e., on September 3, and October 4, 1974) since such arrests were the product of a joint state-federal investigation, and that since the government was not ready to try the defendants within six months of such arrests, the indictments must be dismissed.

In so arguing, defendants place primary reliance on *United States v. Cabral,* 475 F.2d 715 (1st Cir. 1973). The facts of *Cabral* are quite simple. On October 4, 1970, two state police officers drove to a cabin located in a remote section of Maine to investigate a report that parts from a stolen car were being sold there. When they arrived, dressed in plain clothes, they inquired of the appellant and his companion whether certain automobile parts were for sale. The appellant showed the officers some parts and stated that he had additional ones stored in the woods. Before leaving the cabin, however, Cabral pulled out a sawed-off shotgun and took it along "to keep things honest." The foursome then proceeded down a road until a car came into view, but before they reached it one of the police officers ordered Mr. Cabral to "freeze" and arrested him. When he asked why he had been arrested, the police told the appellant it was for possession of the shotgun. After checking the engine number on the car, the appellant and his companion were also arrested for possession of stolen property. The appellant was taken to a local jail and eventually arraigned in state court on a grand larceny charge. Approximately a month later Cabral was transferred to a Connecticut state prison where he was held for past parole violations. Sometime after this transfer the grand larceny charge was dismissed.

On October 7, 1970, three days after Cabral's arrest, the shotgun was turned over to federal authorities. On January 18, 1972, over fifteen months later, appellant was federally indicted for possession of a firearm. In February, 1972, a federal detainer was lodged at the Connecticut prison, and on April 15, 1972, appellant was arraigned on his federal indictment. Cabral's motion to dismiss the indictment pursuant to Rule 48(b), F.R.Crim.P., was denied; Cabral was subsequently convicted and appealed.

In passing on appellant's speedy trial claim, the court found that the government's prosecution of the illegal firearm charge was initiated when state authorities turned over the shotgun to a federal officer three days after Cabral's arrest. On this basis, the court held that appellant's right

to a speedy trial "crystallized at the time of his initial arrest." 475 F.2d at 718.

 *Cabral,* however, is clearly distinguishable from the instant case. First, *Cabral* was not decided pursuant to a Circuit or District Court rule providing for trial within a fixed period of time. Rather, the *Cabral* court addressed itself to broader Sixth Amendment doctrine. Clearly, the rationale underlying the six-month rule is much different from that underlying the guaranty to a speedy trial. The purpose of the rule is

> "to insure that regardless whether a defendant has been prejudiced in a given case or his constitutional rights have been infringed, the trial of the charge against him will go forward promptly instead of being frustrated by creeping, paralytic procedural delays of the type that have spawned a backlog of thousands of cases, with the public losing confidence in the courts and gaining the impression that federal criminal laws cannot be enforced." *Hilbert v. Dooling,* 476 F.2d 355, 357–8 (2d Cir.), *cert. denied,* 414 U.S. 878, 94 S.Ct. 56, 38 L.Ed.2d 123 (1973).

Indeed, the purpose of all the Interim Plans has been to serve the public interest in the prompt adjudication of criminal cases, and not "primarily to safeguard defendants' rights." *United States v. Flores,* 501 F.2d 1356, 1360 n. 4 (2d Cir. 1974). *See also, United States v. Yagid,* 528 F.2d 962, 966 (2d Cir. 1976).

 Second, common sense as well as deeply rooted concepts of federalism dictate that the Speedy trial rules of this District and Circuit must relate only to federal and not state indictments. Each of the speedy trial issues raised by the defendants share a common theme—that the participation of the federal government in the investigation and ultimate arrest of the defendants on state charges necessitates that the date of state arrest mark the commencement of the period in which the government must try defendants under the Interim Plan, and the commencement of the period from which the government's obligation to provide a speedy trial must be measured.

 Since both of these issues coalesce with respect to this pivotal determination, it is important that I stress at the outset my strong conviction that the theory of dual sovereignty requires that the federal government can in no way be bound by the action of state prosecutorial authorities, absent a clear showing of federal intrusion into, and control over state decision-making processes.[5] To hold otherwise would require that the government rush headlong into a federal prosecution whenever a defendant had been arrested on state charges as the result of federal participation in an ongoing investigation. Such a requirement would severely restrict sound prosecutorial discretion, would undermine fundamental doctrines of dual sovereignty, and would defeat the very purposes of the speedy trial rules themselves. I therefore hold that under the facts of this case, defendants' right to a speedy trial pursuant to the Interim Plan did not commence until their arraignment on federal charges. Hence, their rights have not been violated, and defendants' motion to dismiss the indictment based on a violation of these rules must be denied.[6]

---

**5.** It is clear that the doctrine of dual sovereignty is, and has been the law, at least since the decision of the Supreme Court in *United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922). The Court there held that

> "[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."

260 U.S. at 382, 43 S.Ct. at 142.
*See also, Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

**6.** Defendant Navas also argues that since she was named as an unindicted co-conspirator in Indictment 74 Cr. 939 filed on October 4, 1974 (and in superseding Indictment, S 75 Cr. 429) her speedy trial rights must be deemed to have accrued from that point. This contention is clearly incorrect. The speedy trial provisions of the Sixth Amendment (and the speedy trial rules embodied in the Interim Plan) have no application until the putative defendant in some way becomes an "accused," which occurs with the initiation of criminal prosecution, whether by arrest, information, indictment, or other formal charge. *United States v. Marion,*

## II

■ The defendants also press their speedy trial claim under the more general considerations of Rule 48(b), F.R.Crim.P.[7] and the Sixth Amendment.[8]

■ In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court considered the Sixth Amendment guarantee of a speedy trial and adopted an ad hoc balancing test, weighing the conduct of both the prosecution and the defendant in order to determine whether the accused's right to a speedy trial had been violated. The court indicated that some of the factors to be considered were (i) the length of the delay; (ii) the reason for the delay; (iii) the accused's assertion of his right; and (iv) the prejudice to the accused resulting from the delay, along with other relevant circumstances. With regard to these factors, the Court noted that it regarded none of them as a

"necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused,

404 U.S. 307, 313, 320–21, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Defendant Navas did not become an "accused" until the filing of the instant indictment on February 19, 1976.

7. Rule 48(b), F.R.Crim.P., provides as follows: "If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

8. To the extent that defendants challenge the government's delay subsequent to the alleged commission of the crimes charged, but before the filing of the indictment, these claims are not cognizable under Rule 48(b), F.R.Crim.P., or under the Sixth Amendment. *United States v. Marion,* 404 U.S. 307, 312 n. 4, 313, 319, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Finkelstein,* 526 F.2d 517, 525 n. 3 (2d Cir. 1975); *See also, Dillingham v. United States,*

this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution."

407 U.S. at 533, 92 S.Ct. at 2193 (footnote omitted).

With regard to the length of delay, defendants argue that almost a year and a half has passed since their indictment on state charges. This, of course, is true, though hardly determinative. Defendants apparently contend that all the evidence necessary to try this case (including extensive wiretaps obtained prior to 1974) was in the government's hands prior to the 1974 state arrests; that such arrests were the product and culmination of a joint state-federal investigation, and that, as such, the state arrests must somehow be imputed to the government for purposes of adjudicating their Sixth Amendment right to a speedy trial.

For the reasons I have already indicated, defendants' position is untenable as a matter of law.

■ Accordingly, defendants should derive no speedy trial rights with respect to their federal prosecution based on their state arrests. *See United States v. DeTienne,* 468 F.2d 151, 155 (7th Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973).[9] As such the delay in

423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). Rather, they are Fifth Amendment claims and will be discussed *infra.*

9. Again, defendants place primary reliance on *United States v. Cabral, supra. Cabral,* however, involved only a single defendant, and a single transaction. This rather simple situation is in direct contrast to the complex case presently before me. Furthermore, in *Cabral,* the evidence necessary to try both the state as well as the federal charges was obtained simultaneously at the time of the defendants' arrest. In addition, the federal indictment in *Cabral* involved charges on which the state authorities were unable to proceed.

The only case which even arguably supports defendants' position is *Gravitt v. United States,* 523 F.2d 1211, 1215, and n. 6 (5th Cir. 1975). In *Gravitt,* however, the court merely held that a defendant's right to a speedy trial *could* attach while such a defendant was in state custody, where the federal authorities knew where

bringing the defendants to trial from the date of their federal arrest on February 19, 1976, to the commencement of trial on May 24, 1976, is merely three months.

Furthermore, defendants' argument is not supported under the facts of this case.

There is no dispute that federal and local law enforcement officials cooperated in the investigations which, at least in part, led to the arrests of the defendants herein. As the state investigation progressed, Lawrence Herrmann, Assistant District Attorney in the Office of Prosecution of the Special Narcotics Court of the City of New York, advised DEA officials of significant developments and received certain intelligence information from them. In or about May of 1974, a group of Special Agents of the DEA were assigned to work with and under the direction of the New York Police Department operation which was conducting the state investigation.

Some time in 1974, the Special Narcotics Prosecutor's office learned that certain targets of the state investigation were also targets of the federal investigation.

On May, 1974, Frank Rogers, Special Assistant District Attorney, Office of Prosecution, Special Narcotics Courts, City of New York, called a meeting in order to coordinate city and federal investigative and prosecutorial efforts and to avoid duplicative prosecutions. In attendance at that meeting were Assistant United States Attorney Bancroft Littlefield, Jr. of the Southern District of New York, Assistant United States Attorney Charles Clayman of the Eastern District of New York, members of the New York City Police Department and the DEA, and Lawrence Herrmann, Assistant District Attorney.

At that meeting, it was agreed that the state investigation would take precedence over existing related federal conspiracy investigations and other related New York City investigations; that the New York City Prosecutor would prosecute defendants charged with substantive offenses and any co-conspirators it elected to prosecute; that federal prosecutors would prosecute co-conspirators not prosecuted by the New York City Prosecutor; and that the timing of any arrest was to be cleared first with the New York City Prosecutor.[10]

However, as I have already noted, the government's detailed affidavit reveals that the decision to arrest the defendants was made by Lt. O'Shea of the New York City Police Department and was approved of by Assistant District Attorney Lawrence Herrmann. While federal agents were present at, and assisted in the arrests, they were under the command of Lieutenant O'Shea. No federal agent arrested or detained any defendant, or seized any evidence. All arrests were for violations of state law and no defendant was served with a federal summons until the instant indictment.

The government contends that the investigation of this indictment, insofar as it specifically related to the defendants herein, commenced some time after January 23, 1976, at the conclusion of the *Alberto Bravo* trial. It was begun in part because the state had informed the government that its ability to prosecute certain individuals successfully was jeopardized by the loss of the suppression motion granted by Justice Li-

to locate him and where a federal arrest warrant had already issued. Under such circumstances the court was willing to find that defendant's right to a speedy trial attached as of the date that the federal arrest warrant issued. In the instant case, no federal arrest occurred until February 19, 1976, simultaneous with the filing of the indictment.

10. On September 19, 1974, a formal agreement was entered into between federal and local authorities, designating those persons who would be prosecuted by federal prosecutors and those who would be prosecuted by the New York

City prosecutor. The memoranda embodying this agreement, dated September 19 and 20, 1974, were submitted to the court for *in camera* inspection. The memoranda merely indicate which jurisdiction would move against various potential defendants, and adds no new matter to the facts as they have already been established. Since some of the prosecutions set forth in the memoranda are still in progress, and since revelation to the defendants would in no way aid their case, I see no reason to disclose the contents of the memoranda.

ston Coon on September 24, 1975. Once begun, the federal investigation encompassed more potential defendants than were charged in the state indictments.[11]

It is further asserted that the federal investigation which preceded the filing of this indictment drew not only on the investigative data compiled by the state in the wiretap investigation which terminated on October 4, 1974, but also drew heavily upon accomplice witnesses developed by federal agents independent of the state's wiretap investigation, upon evidence obtained by the United States Attorney's Office working in conjunction with Special Agents of the DEA in preparation for the *Alberto Bravo* trial, and upon information obtained and evidence seized by New York City Police, Agents of the Bureau of Customs and Special Agents of the DEA from 1972 through 1974 independent of both the state's investigation and the post-arrest investigation by the United States Attorney's Office. The information and evidence referred to was obtained in Manhattan and on Long Island, in San Antonio, Texas, in Miami, Florida, and in Los Angeles, California.

■ Finally, the government argues that it needed the time between the arrests of the defendants on state charges and the filing of the federal indictment to collect the evidence of the conspiracy charged, to evaluate it and to determine the need for charges to be brought. Part of this evaluation necessarily included consideration of the state charges pending against the defendants, the related penalties, and the like-

lihood that such prosecutions would be successful. Most of the evidence which had to be evaluated and witnesses who had to be debriefed were in use during the *Alberto Bravo* trial (from October 20, 1975 to January 23, 1976). Similarly, the agents and the only federal prosecutor familiar with the investigation were fully occupied with the *Alberto Bravo* trial. Thus it was impossible for those familiar with the investigation to begin the active investigation of this case until after January 23, 1976. These facts do not evidence inexcusable delay; on the contrary, they attest to the thoroughness and careful planning of the government's case. Based on these facts, I am of the view that the length of the delay, and the reasons for such delay, were justifiable under the circumstances.

With respect to the accused's assertion of his right to a speedy trial, the government alleges, and none of the defendants have denied, that no demand for a speedy trial of any charges was made by any defendant until the filing of these motions. Indeed, no such demand could have been made until the filing of the instant indictment on February 19, 1976, unless defendants were prepared to articulate at an earlier date their theory that their arrest on state charges was to be imputed to the federal government and should be deemed to have triggered their federal prosecution. In any event, this factor bears little or no weight in my conclusions.

■ Finally, with respect to the issue of potential prejudice to the accused, it is well

---

11. On this ground, this case is distinguishable from *United States v. DeTienne, supra.* There, the court said, in dicta, that

> "if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provision's applicability as to prosecution for all the interrelated offenses." 468 F.2d at 155.

Here, as in *DeTienne*, the crimes charged in the indictment did not merely "gild" the state charges pending against the moving defendants. Moreover, the different accusatorial dates are explicable in light of the government's interest in putting off federal prosecu-

tion until it appeared that the likelihood of successful state prosecution was remote. *Cf. United States v. Clark,* 398 F.Supp. 341 (E.D. Pa.1975). Finally, the *DeTienne* court refused to allow appellants to invoke their speedy trial guarantee as of the date of their earlier arrests, since those arrests were based on local arrest warrants involving other charges and federal warrants charging unlawful flight to avoid confinement for unrelated state offenses. The court went on to note that

> "[i]t would be absurd in the extreme if an arrest on one charge triggered the Sixth Amendment's speedy trial protection as to prosecutions for any other chargeable offenses." 468 F.2d at 155.

settled that this is to be assessed in light of the interests of defendants which the right to a speedy trial was designed to protect. These interests include (1) the prevention of oppressive pretrial incarceration; (2) the minimization of anxiety and concern of the accused; and (3) the limitation on the possibility that the defense will be impaired by virtue of the delay. *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. 2182.

 Clearly, pretrial incarceration must, to some extent, impair a defendant's opportunity to prepare his case. *See Smith v. Hooey,* 393 U.S. 374, 379–80, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). However, none of the moving defendants has alleged any instance of actual prejudice sufficient to warrant dismissal of the indictment.[12]

Defendant Padilla Martinez argues that his defense is impaired by virtue of the delay in that it is alleged that he made or received certain phone calls on particular days in 1974, and that his ability to recall his whereabouts on those days are seriously compromised by the passage of time and loss of memory, and perhaps witnesses. The government denies knowledge of any such conversations. Furthermore, even if they were to exist there has been absolutely no showing that defendant's recollections could not be refreshed in other ways.

Defendant Navas alleges that she has been prejudiced by virtue of increased anxiety incident to her eighteen-month incarceration on Rikers Island, and the fact that she has a young child who has been shuttled through a series of foster homes while she has been in jail. She further alleges that her ability to recollect events has become dimmed. Of course, the length of defendant's confinement is attributable to the state, not the federal government. Moreover, the nature of the prejudice alleged is

insufficient in my view to warrant dismissal of the indictment.

For the foregoing reasons, defendants' motion to dismiss the indictment for lack of a speedy trial in violation of the Sixth Amendment, and Rule 48(b), F.R.Crim.P., is hereby denied.

*Pre-Indictment Delay*

### III

Defendants urge that the indictment against them must be dismissed because of the unjustified and prejudicial delay in arresting and charging them. The essence of defendants' claim is that at least since the fall of 1974 the government has been in possession of the information and evidence upon which the instant indictment is based, yet it chose not to indict the defendants until some seventeen months later.

In particular, defendants argue that prior to the commencement of the wiretap investigation in January, 1974, the DEA was conducting an investigation into the activities of the Bravo group. It is alleged that the DEA was aware of the state investigatory efforts and formulated overall policy directives on how the investigation was to proceed. Discussions took place at various meetings between state and federal law enforcement officials with regard to the division between state and federal jurisdiction of forthcoming prosecutions and arrests. In particular, it is asserted that in the summer of 1974, Assistant District Attorney Herrmann, who was assigned to the staff of the Special Narcotics Prosecutor, was working at DEA Headquarters and assisted in the preparation of the federal indictments. Furthermore, October 4, 1974, was selected as the date for coordinated arrests on both the state and federal indictments.[13]

---

**12.** While a showing of prejudice is not essential to establish a speedy trial claim, its absence is certainly a factor to be weighed with the reasons for the delay. *See Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *United States v. Quinones,* 516 F.2d 1309, 1311 (1st Cir.), *cert. denied,* 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975).

**13.** On October 4, 1976, defendants Estella and Mario (Evangelista) Navas were arrested by state authorities. On the same date, the defendants named in 74 Cr. 939, were also arrested. After their arrest, Mario and Estella were taken by federal agents to DEA Headquarters in Manhattan and were extensively questioned by federal agents.

In order to sustain a claim of undue prejudice in violation of his rights under the Due Process Clause of the Fifth Amendment, a defendant must show actual prejudice to the conduct of his defense or intentional prosecutorial delay to harass him or to gain some tactical advantage over or to harass him. *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Finkelstein,* 526 F.2d 517, 525 (2d Cir. 1975); *United States v. Ferrara,* 458 F.2d 868, 875 (2d Cir.), *cert. denied,* 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972); *United States v. Stein,* 456 F.2d 844, 848 (2d Cir.), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

It remains unresolved within this Circuit whether the language of *United States v. Marion, supra,* must be read in the conjunctive or the disjunctive—i. e., whether a defendant seeking a dismissal of an indictment on the grounds of pre-indictment delay must demonstrate *either* actual prejudice *or* intentional prosecutorial delay to obtain some tactical advantage, or whether both elements need be proved. *United States v. Finkelstein, supra,* 526 F.2d at 525. *See United States v. Frank,* 520 F.2d 1287, 1292 (2d Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *United States v. Brown,* 511 F.2d 920, 922–23 (2d Cir. 1975); *United States v. Rubinson,* 543 F.2d 951 at p. 961 (2d Cir. 1976). *Cf. United States v. Eucker,* 532 F.2d 249 at p. 255, (2d Cir., 1976). Since the moving defendants have established neither actual prejudice nor intentional delay, this question need not be reached. *See United States v. Finkelstein, supra,* 526 F.2d at 525; *see also, United States v. Ferrara, supra; United States v. Iannelli,* 461 F.2d 483, 485 n. 2 (2d Cir.), *cert. denied,* 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972). *Cf. United States v. Dukow,* 453 F.2d 1328, 1330 (3d Cir.), *cert. denied,* 406 U.S. 945, 92

S.Ct. 2042, 32 L.Ed.2d 331 (1972); *United States v. Clark,* 398 F.Supp. 341, 350 (E.D. Pa.1975).

The mere lapse of time between the arrest of the defendants on state charges in the fall of 1974 and the filing of the instant indictment on February 19, 1976, is not in itself proof of any prejudice to the defendants, or evidence of intentional prosecutorial delay to gain a tactical advantage. *See United States v. Brown, supra,* 511 F.2d at 922. Indeed, courts will not presume the existence of prejudice from the mere fact of delay alone not exceeding the applicable statute of limitations. *United States v. DeMasi,* 445 F.2d 251, 255 (2d Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *United States v. Feinberg,* 383 F.2d 60, 65, 67 (2d Cir. 1967), *cert. denied,* 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968). *Cf. United States v. Marion, supra,* 404 U.S. at 322, 92 S.Ct. 455; *United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

Defendant Padilla Martinez renews the contention made with respect to his Sixth Amendment claim by arguing that he is prejudiced by the delay in filing the indictment due to his inability to reconstruct his whereabouts on certain days when he allegedly participated in incriminating phone conversations.[14] In response, however, the government asserts that it has no reason to believe that Padilla Martinez was a party to any intercepted conversation that will be used in this case. Furthermore, the government argues, even if Padilla Martinez was a party to an intercepted conversation, he has failed to allege that he will be unable to refresh his recollection by reviewing such conversation, or that he has otherwise been unable to preserve evidence needed for his defense. I agree.

Defendants Mario (Evangelista) and Estella Navas also contend that the threat of

14. Defendant Padilla Martinez' allegations are unsupported by affidavit and are contained only in his Memorandum of Law. Defendant Navas has made only conclusory allegations that the conduct of her defense is prejudiced by virtue of her diminished ability to recollect events. To the extent that the other defendants have joined in the Padilla Martinez motion, they have obviously failed to meet the particularized showing of prejudice that is required.

severe sentences in the state courts were used in order to gain their cooperation in the federal prosecutions. No such cooperation, however, was forthcoming and it is difficult to imagine how such threats, if indeed they were made, could now be thought to have prejudiced the defendants in any way.

 It is clear that defendants have failed to make a particularized showing either that a key defense witness or valuable evidence has been lost as a result of the government's delay, or that they are unable to reconstruct the events surrounding the alleged offense, or that the recollections of government or defense witnesses are substantially impaired. *See United States v. Feinberg, supra,* 383 F.2d at 65; *see also, United States v. Schwartz,* 464 F.2d 499, 503–4 (2d Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972); *United States v. DeMasi, supra,* 445 F.2d at 255; *United States v. Stein, supra,* 456 F.2d at 848–49. Diminished recollections of a witness is not the kind of actual prejudice required by *United States v. Marion. See United States v. Foddrell,* 523 F.2d 86 (2d Cir. 1975); *United States v. Finkelstein, supra,* 526 F.2d at 526. *See also United States v. Payden,* 536 F.2d 541 at 543 (2d Cir. 1976). As in *United States v. DeTienne, supra,* the only elements of prejudice which defendants allude to are "the generalized ones of faded memories, anxiety, and oppressive incarceration presumptively attendant on a delay of this length." 468 F.2d at 157. Such a showing is insufficient to sustain dismissal of the indictment on grounds of pre-indictment delay.

 Moreover, there is no evidence on the record before me that justifies the conclusion that the delay in filing the indictment was intentional on the part of the government and was for the purpose of gaining a tactical advantage over the accused. Defendant Padilla Martinez contends that the government engaged in a ploy to "soften up" the defendants by incarcerating them on state charges and by "terrifying them" with threatened sentences of mandatory incarceration of 15 years to life in order to induce them to plead guilty, thereby relieving both the state and federal prosecutors of time-consuming trial preparations and trials.

With respect to the "tactical advantages" obtained by the government by delaying the indictment, defendant Mejias points to several factors. First, such delay relieved the government of having to ready wiretap transcripts with respect to Mario (Evangelista) and Estella Navas for use in the *Bravo* trial, thereby freeing the government to concentrate on the other defendants in the case. Second, it allowed the government two bites at the same apple. If the state prosecution was successful the federal matter would be dropped. If, however, the state prosecution became jeopardized, the government could then step in and renew the federal prosecution. Third, the threat of state proceedings and severe jail terms could be used to threaten the Navases and to coerce their cooperation. Fourth, it allowed the government to relitigate the suppression of evidence which was the subject of the state suppression motion. Finally, it gave the government the experience of the *Bravo* trial and the opportunity to correct any mistakes that had been made there.

Needless to say, any pre-indictment delay creates the possibility of prejudice to the defendant. *United States v. Marion, supra,* 404 U.S. at 322, 92 S.Ct. 455. Defendants' vague and unsupported allegations, however, are hardly sufficient to warrant dismissal of this indictment.[15] It is clear that the New York State authorities were re-

---

15. Defendants' request for an evidentiary hearing on these issues was denied after various of the defendants were given ample opportunity to make a proffer of their asserted need for and right to such a hearing. The proffer demonstrated no area in which an evidentiary hearing would be useful or illuminating. After receipt of further affidavits from Lawrence M. Herrmann and Bancroft Littlefield, I afforded counsel for Mejias a further opportunity to argue the issues presented by the motion. Again, nothing in the proceedings indicated the need for a further evidentiary hearing.

sponsible for defendants' incarceration prior to February 19, 1976. Similarly, the decision as to which, if any, state charges would be brought against defendants, the maximum penalties which can be imposed for conviction on such charges, and decision as to disposition of state charges can hardly be thought of as "tactics" which the federal prosecutors could easily exploit.[16]

█ The delay in bringing the instant indictment was necessary in order for the government to determine the need for and the extent of criminal charges to be brought, to complete its investigation of such charges, and to obtain evidence and the cooperation of witnesses necessary to try the defendants. *See United States v. Feinberg, supra,* 383 F.2d at 64–65; *see also United States v. DeMasi, supra,* 445 F.2d at 255. Defendants have failed to show any "contrived procrastination" by the government, and can detail no prejudicial effect incident to the government's delay beyond mere conjecture. *See United States v. Eucker, supra,* 532 F.2d 249 at 255. It is clear that under these circumstances such delay cannot be held to violate defendants' Fifth Amendment rights.[17]

Accordingly, defendants' motions to dismiss the indictment on the grounds that they have been denied a speedy trial in violation of the Sixth Amendment of the United States Constitution, Rule 48(b), F.R. Crim.P., and the Interim Plan, and on the grounds of pre-indictment delay are hereby denied.

SO ORDERED.

16. Thus, this case is distinguishable from *United States v. Lara,* 520 F.2d 460 (D.C.Cir. 1975), wherein the court found that the government had engaged in deliberate delaying tactics in order to obtain the benefits of a more favorable forum. In *Lara,* however, the government obtained the dismissal of an indictment brought in the District of Columbia and, after a nineteen-month delay, reindicted several of the same defendants in the Southern District of Florida on essentially the same charges and the same evidence. On these facts, the court calculated the delay to trial from the date of the filing of the District of Columbia indictments. Unlike the instant case, it was clear that in *Lara* the decision to shuttle defendants from one forum to another in order to obtain a tactical advantage was well within the control of the federal prosecutors. See also *United States v. DeTienne, supra.*

17. In addition, any pre-indictment delay was well within the applicable statute of limitations, which remains the primary yardstick by which to measure pre-accusation delays to prevent possible prejudice. *See United States v. Marion, supra,* 404 U.S. at 322–23, 92 S.Ct. 455; *United States v. DeTienne, supra,* 468 F.2d at 156; *United States v. Schwartz, supra,* 464 F.2d at 503.