## COMMONWEALTH *vs.* FRANK E. IMBRUGLIA.

Suffolk. December 5, 1978. — April 2, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Due Process of Law*, Delay in commencement of prosecution. *Practice, Criminal*, Delay in commencement of prosecution, Conduct of prosecutor. *Evidence*, Other offense, Relevancy and materiality.

A delay of two years between a defendant's arrest on Federal charges and State indictments arising from the same series of transactions did not require dismissal of the State charges where the defendant was not prejudiced by the delay and where there was no evidence that the delay was reckless or intended to gain a tactical advantage for the Commonwealth. [685-693]

At the trial of two indictments charging the defendant with receiving stolen securities and possession of counterfeit currency with intent to pass the same as true, the judge did not abuse his discretion in admitting evidence of the defendant's fencing activities other than those which were the subject of the indictments where the evidence related to the same period during which the crimes charged allegedly occurred and tended to establish knowledge, intent, motive and method, material to proof of the crimes charged. [693-696]

INDICTMENTS found and returned in the Superior Court on October 29, 1975.

The cases were tried before *Tamburello*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Dyanne Klein Polatin* for the defendant.

*Barbara T. Shurpin*, Special Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was convicted on two indictments of receiving stolen securities and one indictment of possession of counterfeit currency with intent to pass the same as true. On appeal, transferred here on our own

motion (G. L. c. 211A, § 10 [A]), he argues two assignments of error: (a) that a two-year pre-indictment delay denied him his right to due process, and (b) that the admission of evidence of other crimes was prejudicial. Finding no error, we affirm.

The three indictments stem from an undercover investigation of the defendant's activities by the United States Secret Service. In late August, 1973, Secret Service Agent Francis Searle received a tip from an informant, Guy Sylvestro, that the defendant was allegedly fencing stolen securities. Sylvestro apparently was a long-time acquaintance of the defendant. As a result of the tip, a meeting was arranged at which Sylvestro would introduce a Frank Cetti to the defendant. In reality, Cetti was Searle.

During the next six weeks, Searle obtained from the defendant and others stolen securities worth a substantial sum and fake United States currency. The first transactions were for relatively small sums and appear to have been preliminary to a later, larger transaction. From the record, it is apparent that the Secret Service planned to have Searle gain the defendant's confidence and then impress on the defendant and others that he could "move" or convert into cash large quantities of stolen securities. The key element of the plan was Searle's acquaintance with an allegedly corrupt loan officer at The First National Bank of Boston. In meetings and conversations with the defendant and the defendant's partner, Robert Donati, Searle explained that the loan officer could approve loans of $100,000 without obtaining authorization from any other bank official. Searle further explained that this loan officer was in some sort of financial trouble and, for a share of the booty, would be willing to process loans accepting the stolen securities as collateral. Like Searle, the would-be loan officer was a Secret Service agent. The defendant went for the bait and began to acquire securities worth a considerable sum.

It appears in the record, but not in the evidence submitted to the jury, that as a result of the bank scheme, Federal agents arrested the defendant on October 17, 1973, with Donati and four others for receiving, concealing, bartering, and disposing of stolen securities of the value of $5,000 or more which were part of interstate commerce (18 U.S.C. § 2315 [1970]). A charge of conspiracy was later added (18 U.S.C. § 371 [1970]). The securities which apparently were the subject of these charges were five $100,000 treasury notes and one $15,000 treasury note passed to Searle on the day of arrest. In December, 1975, the defendant was convicted in Federal District Court of both offenses and sentenced to concurrent terms of five and seven years. Part of the same series of events resulted in indictments by the Commonwealth. A Suffolk County grand jury indicted the defendant on October 29, 1975, for receiving 144 Series E United States Savings Bonds of a value in excess of $100 stolen from John and Evelyn Concannon, for possession of nine counterfeit ten-dollar bills, and for receiving twenty-six[1] Series E Savings Bonds of a value in excess of $100 stolen from Gertrude Haggerty. The indictments alleged that these offenses occurred respectively on September 4, 1973, on or about October 1, 1973, and on October 16, 1973.[2]

At the trial of these indictments, the prosecution introduced a stipulation of the parties that the Concannon and Haggerty bonds had been stolen. In dispute then was the defendant's possession of the bonds and counterfeit bills and his knowledge and intent with respect to their status. The Commonwealth's case rested largely on the testimony of Secret Service Agent Searle, who purportedly re-

---

[1] This indictment was amended at trial to refer to twenty-four savings bonds. The value of the stolen property remained over $100.

[2] The defendant argued before trial that, in light of the Federal trial, these indictments subjected him to double jeopardy, and he moved for dismissal. The judge denied the motion. See Commonwealth v. Cepulonis, 374 Mass. 487, 490-497 (1978). The defendant does not argue this issue on appeal.

ceived the stolen bonds and counterfeit money from the defendant. The other government witnesses were also Secret Service agents, and their testimony corroborated various aspects of Searle's testimony.

The defendant asserted prior to trial that he would claim entrapment as a defense. He did not, however, produce any witnesses to substantiate this claim and did not himself take the stand. Indeed, the only witness called by the defendant was Agent Searle and then only for impeachment purposes.

1. *Pre-indictment Delay.*

Two years elapsed between the commission of the alleged offenses charged and the State indictments. Claiming that this delay had denied him due process, the defendant filed a pretrial motion to dismiss.[3] In support of this motion, the defendant filed an affidavit which states in essence that before the instant charges issued, the defendant was arrested on Federal charges arising from the same series of transactions. The affidavit further states that the defendant was ultimately convicted of the Federal charges and sentenced to a term of seven years in Federal prison to be served on and after a State sentence he was then serving on unrelated charges at the Massachusetts Correctional Institution at Norfolk. The affidavit also states that as a result of the delay before the State indictments the defendant was prejudiced in his defense and prejudiced in the possibility of obtaining a concurrent sentence with the Federal sentence imposed for essentially the same series of transactions.

At a pretrial hearing the defendant in argument elaborated on the prejudice to his defense allegedly caused by delay. He suggested that the delay would generally weak-

---

[3] In arguing the motion below, defense counsel also suggested that, once Federal agents had arrested the defendant, he had become an accused for purposes of the State charges and therefore qualified for the remedies afforded by constitutional and statutory speedy trial provisions. The defendant does not pursue this argument on appeal. See *Commonwealth* v. *Gove*, 366 Mass. 351, 358-361 (1974).

en his ability to recall events accurately, and had deprived him of Sylvestro's testimony, which he claimed was crucial to his defense of entrapment. He further suggested that the delay served no legitimate law enforcement purpose.

The defendant called two witnesses in support of these claims: Secret Service Agents Francis Searle and James Monahan. Searle explained Sylvestro's participation in the investigation and his relationship to the Secret Service. Sylvestro introduced Searle to the defendant and continued on occasion to supply the agency with pertinent information during the course of the investigation. For his participation, Sylvestro received a sum of money from the agency. Searle testified that his last contact with Sylvestro was by telephone in 1974; according to Searle, Sylvestro had telephoned from Florida. Monahan also testified that he had had no contact with Sylvestro since 1974.

From Agent Monahan, defense counsel elicited testimony that the Federal investigation of the defendant was complete as of the defendant's arrest on October 17, 1973. He and Searle testified, however, that the investigation was not a joint effort between State and Federal law enforcement agencies, nor did a liaison exist between the two sovereignties on the matter. On October 16, Monahan spoke with Detective Walsh of the Boston police department and asked him to help identify an individual who had come within the scope of the agency's investigation of the defendant. On October 17, Detective Walsh and Detective Connolly were present at the arrest of the defendant by request of Agent Monahan. Monahan explained that it was normal practice to inform local police of a planned arrest. Monahan further testified that when he spoke with Detective Walsh he did not suggest that the defendant's activities involved possible violations of State law. Monahan claimed that in fact he first became aware of a possible violation of State law in a conversation with Boston police Detective Robert Patenaude in April, 1975.

Monahan testified that he had mentioned the approaching Federal trial of the defendant and had expressed regret that the Federal code did not permit prosecution of the defendant for some of the packages of securities passed to Searle. When Patenaude informed Monahan that some of the securities obtained could serve as the basis for a State prosecution, Monahan supplied the Suffolk district attorney with the relevant evidence. The Suffolk indictments were then issued in October, 1975.

The prosecution introduced no evidence of its own at the pretrial hearing. It argued, however, that the evidence already adduced established that the Commonwealth had not sought the indictments sooner because State law enforcement officials were unaware until April, 1975, that the Federal investigation had uncovered possible violations of the State criminal law. The prosecution maintains that delay in such circumstances does not warrant dismissal. It also denied that the defendant had suffered actual prejudice due to the delay. Without making any findings, the trial judge denied the defendant's motion to dismiss.

This court has followed the Supreme Court of the United States[4] in analyzing the due process consequences of a pre-indictment delay. See *Commonwealth* v. *Canon*, 373 Mass. 494, 498-499 (1977), cert. denied, 435 U.S. 933 (1978); *Commonwealth* v. *Horan*, 360 Mass. 739, 740-742 (1972). The Supreme Court has acknowledged that the applicable statute of limitations, which is the primary safeguard against being compelled to answer overly stale criminal charges, see *Commonwealth* v. *Jones*, 360 Mass. 498, 501-502 (1971), "does not fully define [a defendant's] rights with respect to the events occurring prior to indictment." *United States* v. *Marion*, 404 U.S. 307, 324 (1971).

---

[4] The Supreme Court has considered pre-indictment delay in the context of Federal and not State criminal prosecutions. Its analysis has relied therefore on the due process clause of the Fifth Amendment.

Even when the indictment issues within the statutory period, pre-indictment delay may violate those " 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney* v. *Holohan,* 294 U.S. 103, 112 (1935), and which define 'the community's sense of fair play and decency,' *Rochin* v. *California,* [342 U.S. 165,] at 173 [(1952)]." *United States* v. *Lovasco,* 431 U.S. 783, 790 (1977). The acknowledged remedy for delay is dismissal of the indictments. *United States* v. *Marion, supra* at 324-325. *Commonwealth* v. *Horan, supra* at 741-742.[5]

Due process inquiry must first focus on whether the defendant has suffered actual prejudice due to the delay. On the record before us, the trial judge could conclude that the defendant had not sustained his burden to show prejudice. See *Commonwealth* v. *Jones, supra* at 502. Cf. *Commonwealth* v. *Gilbert,* 366 Mass. 18, 22 (1974) (speedy trial). The defendant's claim of prejudice seems based largely on the unavailability of Sylvestro as a witness for the defense, coupled with the claim that Sylvestro would assist materially in the defendant's claim that he was entrapped.[6]

This argument fails on two grounds. The defendant offered no evidence that the absence at trial of Sylvestro was due to delay. The defendant did not allege or prove that Sylvestro had died before trial, see, e.g., *Commonwealth* v. *Horan, supra; United States* v. *Lovasco,* 431 U.S. 783 (1977); *United States* v. *Brand,* 556 F.2d 1312 (5th Cir. 1977), cert. denied, 434 U.S. 1063 (1978); *United States* v. *Norton,* 504 F.2d 342 (8th Cir. 1974), cert. denied, 419 U.S. 1113 (1975), or that his whereabouts or identity had

[5] Once a person stands accused, he may demand a speedy trial under art. 11 of our Declaration of Rights, the Sixth Amendment to the United States Constitution, or G. L. c. 277, § 72A (if applicable). There is little that an unwitting suspect can do either to hasten his arrest or dispel suspicion.

[6] This defense was not pursued at trial.

become unknown, see *United States* v. *Quinn,* 540 F.2d
357 (8th Cir. 1976). In a colloquy with the judge, the de-
fendant himself acknowledged that he knew where Syl-
vestro lived and worked.[7] Defense counsel apparently
sought to show that Sylvestro was under the control of
the prosecution and would not comply with his summons,
but the judge found at trial that Sylvestro was not under
the control of the prosecution, and that the defendant had
not shown that Sylvestro had ever received a summons to
appear.[8] Second, and more significantly, the judge found
that Sylvestro was not crucial to the defendant's case.
The defendant offered no evidence to prove that Sylvestro
would exculpate him.[9] Moreover, although Sylvestro set
the investigation in motion, he was not present when any
of the transactions in the State indictments transpired.

Additionally, "[t]he likelihood that the loss was
prejudicial is eased by the reliability of the evidence pre-
sented by the government." *United States* v. *Norton, su-
pra* at 344. Here, there was overwhelming evidence of the
defendant's predisposition to commit the crimes charged.
Consequently, even if Sylvestro's absence had resulted

---

[7] According to the defendant, his attorney in the Federal trial had
Sylvestro under surveillance in October, 1975.

[8] The defendant's only effort to procure Sylvestro was to leave a
summons at Sylvestro's last known address with a woman who was
purportedly Sylvestro's wife. There was no evidence that in fact the
woman was Sylvestro's wife or that, whoever she was, she gave the
summons to Sylvestro. Although the defendant claimed to know Syl-
vestro's place of business, he made no effort to serve Sylvestro there.
Lastly, at the urging of defense counsel, the trial judge ordered a
summons to issue to Sylvestro's last known home address. Finding the
house vacant, the server left the summons.

[9] The following colloquy occurred at the pretrial hearing:
THE DEFENDANT: "[W]ithout him [Sylvestro] I have no defense at
all."
THE JUDGE: "He could also hurt you."
THE DEFENDANT: "I don't care. I will take that chance, Your Honor."
And in arguing a motion to enlist the Commonwealth's assistance
in procuring Sylvestro, defense counsel said: "I have never talked to
[Sylvestro]. Maybe he would not support my entrapment defense."

from the delay, it did not so prejudice the defendant as to support dismissal.

The defendant's claim that the delay had dimmed his memory represented only the possibility of prejudice at the time of the hearing, and is inadequate to trigger the protection of due process. *United States* v. *Marion*, 404 U.S. at 323-324. Given that he did not take the stand, this possibility never became an actuality.

The defendant also claims prejudice in losing an opportunity to receive concurrent State and Federal sentences.[10] We acknowledge that if the trial below had occurred before the Federal trial, the defendant might have received a Federal sentence that ran concurrently with the State sentences arising from the convictions for related offenses. 18 U.S.C. § 4082 (1976). See *United States* v. *Johnson*, 563 F.2d 362, 364 (8th Cir. 1977). See also ABA Standards Relating to Sentencing Alternatives and Procedures § 3.5 (Tent. Draft 1967). Even accepting for purposes of argument the defendant's contention that the State court could not make its sentence run concurrently with the Federal sentence, but see Annot., 18 A.L.R.2d 511, 512-514 (1951 & Supp. 1973), the lower court was not, however, without power to fashion a disposition equally as favorable to the defendant as concurrent sentences. See generally *United States* v. *Cabral*, 475 F.2d 715, 720 (1st Cir. 1973); *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975); G. L. c. 276, § 87. Accordingly, the legitimate exercise of judicial discretion may have determined the defendant's sentences as much as the order of trials.[11]

---

[10] Defense counsel argues that delay denied the defendant an opportunity for concurrent sentences in two respects; because the trial below occurred after the Federal trial, the Federal court could not make its sentence concurrent with the later State sentences for related offenses, and the State court could not make its sentence concurrent with an earlier State sentence imposed before the Federal trial for an unrelated offense. The latter allegation is advanced for the first time on appeal, has no support in the record, and thus need not concern us.

[11] It is not without significance that the judge below, who was famil-

In any event, the possibility of prejudice at disposition does not weigh heavily in favor of dismissal on a pretrial motion to dismiss because it does not affect the defendant's ability to mount a defense. It is protection of this capability which we view as the primary purpose of pre-indictment due process analysis. Compare *United States* v. *Marion*, 404 U.S. at 324-325, with *Smith* v. *Hooey*, 393 U.S. 374, 378 (1969).

Even if the defendant had made a persuasive showing of actual prejudice, dismissal would not be required. Proof of prejudice is a necessary, but not sufficient element of a due process claim. *United States* v. *Lovasco*, 431 U.S. at 790. "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *United States* v. *Marion, supra.* Accordingly, the due process inquiry must also consider the reasons for delay. *United States* v. *Lovasco, supra.* If, in addition to causing prejudice, delay has been intentionally undertaken to gain a tactical advantage over the accused or has been incurred in reckless disregard of known risks to the putative defendant's ability to mount a defense, dismissal is appropriate. *Id.* at 795 & n.17. Cases suggesting that a delay due to negligence may justify dismissal are distinguishable. See, e.g., *Commonwealth* v. *Beckett*, 373 Mass. 329, 343-344 (1977) (Liacos, J., concurring) (speedy trial case); *Commonwealth* v. *Dabrieo*, 370 Mass. 728, 736-737 (1976) (same); *United States* v. *Quinn*, 540 F.2d 357, 360 n.2 (8th Cir. 1976) (decided before *Lovasco*); *United States* v. *Cabral*, 475 F.2d at 718 (speedy trial case). But cf. *United States* v. *Brand*, 556 F.2d 1312, 1317 n.7 (5th Cir. 1977).

---

iar with the defendant's record, declined to impose the minimum from and after term of imprisonment as requested.

There was no evidence that the delay at issue was reckless or intended to gain a tactical advantage. Instead, the evidence suggests that as in *Commonwealth* v. *Canon*, 373 Mass. 494, 498-499 (1977), the delay resulted from the district attorney's lack of knowledge of the defendant's criminal activities.[12] Once the prosecution was in possession of the evidence, it moved expeditiously. In such circumstances, there has been no deviation from elementary standards of fair play and decency, and dismissal is unwarranted.

The defendant's view of the events does not require a contrary result. He suggests that by assisting in the Federal investigation and arrest, Detectives Walsh and Connolly were engaged in a cooperative effort with the Secret Service. Citing the doctrine that when police are engaged in a cooperative effort the knowledge of one is the knowledge of all, see *Commonwealth* v. *Ballou*, 350 Mass. 751, 757 (1966), cert. denied, 385 U.S. 1031 (1967); *Commonwealth* v. *McDermott*, 347 Mass. 246, 249 (1964), the defendant argues that the knowledge possessed by the Federal agents as to his allegedly illegal activities must be imputed to Detectives Walsh and Connolly and hence to the Commonwealth.

The defendant's argument is unpersuasive. Detectives Walsh and Connolly were not engaged in a cooperative effort with the Secret Service. Their involvement — identifying an individual who had come within the scope of the Federal investigation, and maintaining a presence at the defendant's arrest — was determined by Agent Monahan, and was limited and supplementary to the over-all effort. The purpose of their presence at the arrest was quite distinct from the purpose of those Secret Service agents in attendance; according to Agent Monahan's testimony, Walsh and Connolly were there to protect the

---

[12] The defendant makes no suggestion that the Secret Service wrongfully withheld from the State prosecution evidence of his activities.

public and not to effect the arrest. It does not appear that these officers were aware of any violations of State law, nor was there evidence that the district attorney's office was aware of the investigation conducted by the Secret Service until April, 1975.

We note also that delay after the prosecution has acquired sufficient knowledge to begin proceedings does not require a judge to conclude that the delay was improper even when another prosecutorial unit in possession of the same evidence has gone ahead without delay. See *United States* v. *Mejias*, 417 F. Supp. 585 (S.D.N.Y. 1976), aff'd 552 F.2d 435 (2d Cir.), cert. denied sub nom. *Padilla-Martinez* v. *United States* and *Navas* v. *United States*, 434 U.S. 847 (1977).[13] It was not error to deny the motion to dismiss.

2. *Evidentiary Issues.*

The prosecutor, over the defendant's objections, motions for mistrial, and motions to strike, introduced evidence of the defendant's fencing activities other than those which were the subject of the indictments tried. This evidence included testimony that the defendant had sold to Searle a package of stolen savings bonds from New York at their initial meeting on August 29, 1973, that on numerous occasions before October 2 the defendant and Donati offered to sell counterfeit United States currency, that on August 31 the defendant and Donati had claimed

---

[13] In *United States* v. *Mejias*, State and Federal law enforcement officials cooperated in a drug investigation in which both State and Federal charges were contemplated. The Federal prosecution did not go forward, however, until the State prosecution foundered because of a successful motion to suppress. The court held "that the federal government can in no way be bound by the action of state prosecutorial authorities, absent a clear showing of federal intrusion into, and control over state decision-making processes. To hold otherwise would require that the government rush headlong into a federal prosecution whenever a defendant had been arrested on state charges as the result of federal participation in an ongoing investigation. Such a requirement would severely restrict sound prosecutorial discretion, [and] would undermine fundamental doctrines of dual sovereignty ..." (footnote omitted). *Id.* at 591. See also *id.* at 598.

access to packages of stolen bonds, stolen stocks, and counterfeit American Express checks, and that the defendant had asked Agent Collins, who posed as the corrupt loan officer, to explain how, after delivering the stolen bonds to the bank, he would get the phony loan out of the bank. It was offered also to show that on October 16, 1973, Donati had said that he had sent somebody by airplane to pick up the bonds for the bank deal and that the bonds had been brought back by car, that at a later meeting on October 16, 1973, the defendant had shown Searle a $100,000 treasury note, and that at the same meeting, Richard Shocker, introduced by the defendant as his partner Jerry, offered to provide disguises to those who would deliver the bonds to the bank. The prosecution also introduced recorded telephone conversations between Searle and the defendant, and Searle and Donati, in which the defendant and Donati referred to various stolen property and generally exhibited interest in Searle's professed ability to move large quantities of such property. This evidence is the subject of a catchall assignment of error, argued on appeal, in which the defendant claims that such evidence is irrelevant and prejudicial. The claimed error is twofold: first, that the judge erred in admitting the evidence, and second, that the prosecutor erred in ignoring the judge's frequent requests to limit introduction of such evidence even though relevant.

At the outset, we note that not all the evidence referred to in the assignment of errors or the defendant's brief need concern us. Although the judge initially permitted the prosecutor to introduce evidence of the August 29 transaction, he later instructed the jury to disregard any reference to it. He also sustained the defendant's objection to the admission of the physical evidence of that transaction, and although the judge permitted the prosecutor to elicit testimony about statements by Shocker in the defendant's presence, the judge struck the response which referred to disguises. We also note that the conversations about counterfeit currency occurring be-

fore the date on which the defendant is charged with wrongful possession were precedent to a contemplated sale of such currency to Searle, and thus were part of the transaction described in the indictment.

We now turn to the remaining evidence challenged. The principle on which the defendant rests his first argument is well established: commission of an independant crime cannot be admitted to show commission of the crime charged. See, e.g., *Commonwealth* v. *Baldassini*, 357 Mass. 670, 677-678 (1970); *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). When, however, the evidence is not too remote in time, or is connected with the facts of the case, it may be admitted to establish "knowledge, intent, motive, method, material to proof of the crime charged." *Commonwealth* v. *Murphy*, 282 Mass. 593, 598 (1933). See *Commonwealth* v. *Baker*, 368 Mass. 58, 85-86 (1975). See generally W. B. Leach & P. J. Liacos, Massachusetts Evidence 302-303 (4th ed. 1967). The evidence offered meets both these criteria. The evidence in issue relates to the six-week period during which the crimes charged allegedly occurred. See *Commonwealth* v. *Baldassini, supra* at 679. Moreover, the evidence tended to show that the defendant and his partners frequently handled stolen property and counterfeit currency of the type described in the indictments. It thus bore on a proposition crucial to the Commonwealth's case: that the defendant knew that the Haggerty and Concannon bonds were stolen and that the ten-dollar bills passed to Searle were counterfeit. See *Commonwealth* v. *Segal*, 3 Mass. App. Ct. 732, 733 (1975). See also *Commonwealth* v. *Baldassini, supra* at 677-679.

We cannot say that the trial judge abused his discretion in concluding that testimony on the defendant's other fencing activities was more probative than prejudicial. In addition, the judge was careful to keep the trial focused on the specific crimes charged. See *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 498-499 (1978). The judge warned the jury, see *Commonwealth* v. *Clifford*, 374

Mass. 293, 298 (1978), that the evidence suggesting the commission of other crimes had been admitted for the limited purpose of proving the defendant's knowledge and intent with respect to the crimes charged; he requested the prosecutor not to retry the Federal cases; he excluded some of the evidence offered; and he repeated his cautionary comments to the jury in his charge.

Finally, we find no merit in the defendant's contention that the prosecutor engaged in prejudicial excesses. The evidence offered was not plainly inadmissible and therefore we cannot say that the prosecutor "should have . . . anticipated" adverse rulings. *Commonwealth* v. *Redmond*, 370 Mass. 591, 596 (1976). We also cannot say that the prosecutor disregarded the judge's directives relative to evidence of other crimes.

*Judgments affirmed.*