## COMMONWEALTH vs. JAMES E. SILVA, JR.

Bristol.  December 8, 1982. — March 21, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide.  Felony-Murder Rule.  Constitutional Law*, Admissions and confessions.  *Evidence*, Admissions and confessions, Other offense.  *Practice, Criminal*, Instructions to jury, Capital case, Comment by prosecutor.

On a motion to suppress statements made to police by a seventeen year old criminal defendant, the judge correctly concluded, in the totality of the circumstances, that the lapse of time between the defendant's being advised on his Miranda rights and his making inculpatory statements to the police was not significant and that he had knowingly, voluntarily and intelligently waived his Miranda rights.  [500-503]

On appeal of a conviction of murder in the second degree, the defendant contending that his conviction should be reversed because the judge, in instructing on the issue of felony-murder, gave no instruction that the jury must find, from the circumstances of the underlying felony, that he acted with a conscious disregard for human life, this court concluded that, even without application of the felony-murder doctrine, the proof of malice was overwhelming, as established by the defendant's admissions, and that, under the miscarriage of justice standard, the defendant was not entitled to a reversal of his conviction based on a retrospective application of the principles established by *Commonwealth* v. *Matchett*, 386 Mass. 492 (1982), and *Commonwealth* v. *Moran*, 387 Mass. 644 (1982).  [503-506] O'CONNOR, J., dissenting.

At a murder trial, the judge did not err in his instructions to the jury on involuntary manslaughter in refusing to make an explicit reference to the specific facts on which the defendant based his defense.  [506-507]

At the trial of an indictment charging larceny of a motor vehicle, the judge did not abuse his discretion by admitting in evidence the unobjected-to testimony of a prosecution witness that the defendant had told him that the destination to which he had driven the vehicle was a place where other stolen vehicles had been concealed and burned, although the witness also testified that the defendant had never told him that he had stolen the vehicles or that he had burned them, where the testimony was relevant to the proof of his larcenous intent.  [507-508]

At a murder trial, statements by the prosecutor in closing argument an-
alogizing the defendant's carrying of the body of the victim to carrying
a live body or a baby, in order to refute the defendant's claim that he
believed the victim was dead, were not improper; nor did the prosecu-
tor improperly interject his personal belief as to premeditation.
[508-509]

INDICTMENTS found and returned in the Superior Court
Department on February 12, 1979.

The cases were tried before *Taveira*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*Francis M. O'Boy (Lawrence Moniz* with him) for the de-
fendant.

*Phillip L. Weiner*, Assistant District Attorney *(Patricia
O. Ellis*, Assistant District Attorney, with him) for the
Commonwealth.

HENNESSEY, C.J.  The defendant, James E. Silva, Jr., was
indicted by a Bristol County grand jury on February 12,
1979, for murder, kidnapping, and three counts of larceny
of a motor vehicle.  On October 18, 1979, the defendant
was found guilty by a jury of murder in the second degree,
kidnapping, and one count of larceny of a motor vehicle.
The trial judge imposed the mandatory life sentence on the
murder conviction and, on each of the other charges, im-
posed sentences of not less than three nor more than five
years, to be served concurrently with the life sentence. The
defendant filed a notice of appeal and we transferred the
case to this court on our own motion.

On this appeal the defendant claims error in that (1) the
judge denied his motion to suppress certain statements he
had made to the police; (2) the judge did not instruct the
jury that the felony-murder rule applies only if the jurors
find, from the circumstances of the underlying felony, that
the defendant consciously disregarded risk to human life;
(3) the judge failed to instruct the jury with regard to the
defendant's belief as to whether the victim was alive or dead;

(4) the judge did not exclude evidence of other crimes; and
(5) the prosecutor made improper remarks during closing
argument. The defendant also argues that he should
receive relief under G. L. c. 278, § 33E. We conclude that
there is no reversible error, and that the defendant is not en-
titled to relief under § 33E. Accordingly, we affirm the
judgments.

On January 12, 1979, Beatrice Miller met her sixty-two
year old mother, Diane Dion, and drove her to a doctor's
appointment, then to the supermarket to do some shopping,
and finally to Haskins Pharmacy in Norton. At approxi-
mately 10:45 A.M., Miller parked her automobile next to the
pharmacy and left the engine running. She entered the
pharmacy and remained there only a few minutes. As she
was returning to her vehicle, she observed it being driven
off by a young man wearing a dark jacket with a beige or
tan fleece collar. Her mother was still seated in the vehicle.
Miller ran back into the drugstore and notified the police.

The following day, the vehicle in which the victim was
abducted was found in Norton on the grounds of the Paul A.
Dever School. The vehicle had been burned and was
parked near several other burned vehicles. The remains of
the victim's body and her personal effects were found in the
trunk of the vehicle. Doctor George Katsas, a medical ex-
aminer, testified at trial that the victim was alive when the
fire started and died as a result of that fire. He based his
conclusion on the presence of smoke in the deep recesses of
the lungs and on the level of carbon monoxide found in the
blood. There was no medical evidence as to whether the
victim was conscious while she was in the trunk.

On January 14, 1979, in the late evening hours, the de-
fendant was brought to the North Attleborough police sta-
tion for questioning regarding his possible involvement in
the victim's death. At approximately 12:05 A.M., Bruce
Gordon, a State police trooper, advised the defendant of his
Miranda rights. Gordon also informed the defendant that,
if he agreed to speak, the conversation would cease at any
time at his request. The defendant responded that he un-

derstood his rights and was willing to speak. Gordon then presented a North Attleborough police department waiver of rights form to the defendant and asked him to read it. After the defendant finished reading the form, Gordon asked him whether he understood it. The defendant responded affirmatively and signed the form as Gordon requested him to do.[1] In addition to signing his name, he was asked to write on the waiver form that he was a "homicide" suspect, which he did. Gordon questioned the defendant for approximately ten to fifteen minutes. The defendant admitted that on the morning of January 12, 1979, he was standing in front of Haskins Pharmacy but denied any role in the kidnapping and death of the victim.

Gordon then asked the defendant, who had not yet been placed under arrest, whether he was willing to accompany the police officers to the Norton police department for further questioning. The defendant agreed to go with them. During the trip to the Norton police department, which lasted approximately twenty minutes, the defendant sat in the rear of an unmarked police cruiser with Detective Brugliera while two State police troopers sat in the front seat. No questioning occurred during this trip.

Once at the police station, Detective Brugliera sat alone with the defendant and inquired whether he understood his Miranda rights as previously given and whether he was still willing to speak with him. The defendant responded affirmatively to both questions. Brugliera also told the defendant that he did not have to speak, and the defendant responded that he understood that and was still willing to speak. Brugliera then confronted the defendant with evidence implicating him in the crimes, including the facts that the defendant's father saw him standing in front of the pharmacy on January 12, that the man whom the victim's

---

[1] Detective Joseph Brugliera of the Norton police department excised the words "North Attleborough" which appear on the form and wrote in their place the word "Norton." We reject the defendant's contention that this change, which did not affect the content of the form, demonstrates that the police coerced the defendant into relinquishing his rights.

daughter had seen drive off with her mother wore a coat similar to that of the defendant, and that the defendant was familiar with one of the burned vehicles found on the school grounds.

The defendant made incriminating statements. He stated that he was standing in front of the pharmacy when he observed a vehicle with its engine running parked next to the pharmacy. After the driver left the vehicle and entered the pharmacy, he approached the vehicle, opened the door, and entered. As he started to shift the vehicle into gear, he heard a woman say, "You're in the wrong car." He turned toward the passenger seat and saw a woman, seated next to him, whom he later learned to be Diane Dion. The defendant shifted the vehicle into reverse and drove through the pharmacy's parking lot and onto the street. The defendant stated that he continued to drive and that as he drove he spoke with the victim, who told him that she suffered from high blood pressure and had just returned from the doctor's office. As the defendant drove through the grounds of the Paul A. Dever School, the victim started to slump forward and then passed out. While the defendant was driving, the victim kept falling onto him, so he stopped the vehicle. He attempted unsuccessfully to revive her using mouth-to-mouth resuscitation. He then removed grocery bags from the vehicle's back seat and placed the victim there.

The defendant continued to drive through the school property, and at some point placed the victim in the trunk of the car. He stated that when he did so he was not certain whether she was dead or alive. He then drove the car onto a cart path area. He parked the vehicle to the right of two burned vehicles, which he already knew were there. He then removed papers from the glove compartment and a blanket from the front seat, and placed them on the back seat. He set the blanket and papers on fire and remained at the scene for approximately five minutes until the vehicle became engulfed in flames. He then left the area and returned home.

After speaking with Brugliera, the defendant, at approximately 2 A.M., gave a similar statement to Lieutenant

Clarkson of the State police. The defendant stated further, however, that he had gone to the pharmacy to steal an automobile to go "joy-riding."

A short while later the defendant spoke with his parents. After his parents left, the defendant asked to speak with Benton Keene, the chief of police. The defendant knew that the victim was Keene's mother-in-law and wanted to tell him what had happened in his own words. The defendant then made essentially the same statement to Keene.

After the defendant spoke with Keene, the police assembled at approximately 3 A.M. to conduct a stenographic interview with the defendant. At this time Clarkson readvised the defendant of his Miranda rights, and the defendant indicated that he desired to speak with an attorney. Since the police continued the interview notwithstanding the defendant's assertion of his right to speak with an attorney, the judge suppressed the substance of this interview and did not allow its use at trial.

At trial, the defendant basically restated the information which he had given to Brugliera. He also testified that he initially took the vehicle only for a "joy ride." He stated that, after he became aware of the victim's presence in the vehicle, he became scared, began driving, panicked and, consequently, did not stop the vehicle. The defendant further stated that, after the victim became unconscious, he examined her pulse and did not believe that she was still breathing. He testified that he thought she was dead when he put her in the trunk. The defendant admitted that he had taken other vehicles for "joy rides," had subsequently stolen some of their parts, and had eventually sold these parts. He also admitted that he had burned the other vehicles located in the cart path area of the school.

1. The defendant's first argument is that the judge erred in denying his motion to suppress statements made to police officers, since the defendant had not knowingly and intelligently waived his Miranda rights. We disagree. It is clear that the Commonwealth bears a heavy burden in demonstrating that the defendant made a knowing, intelligent,

and voluntary waiver of his Miranda rights. *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966). *Commonwealth* v. *Murray*, 359 Mass. 541, 546 (1971). To determine whether to admit a defendant's statements, a court must examine the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Commonwealth* v. *Tavares*, 385 Mass. 140, 146 (1982), citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973). See *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975).

The judge denied the defendant's motion to suppress those statements made by the defendant before the hour of 3 A.M. on January 15.[2] The judge specifically concluded that at the North Attleborough police station the defendant had been advised of his Miranda rights and had stated, both in oral and written statements, that he understood them. The judge found further that at the Norton police station the defendant agreed to waive his rights and speak with the officers, and that, even though the defendant was not warned of his rights again, "there was no significant lapse of time between the warnings and the defendant's inculpatory statements." The judge determined further that the defendant possessed no personal characteristics which rendered him particularly suspectible to police pressure. See *Tavares, supra* at 145. Specifically, he found that the defendant, age seventeen, had received better than average grades in school, was experienced with the law, and was not impaired mentally by either drugs or alcohol at the time of the interviews with the police. Finally, the judge determined that there was no evidence that the police used trickery or promises of leniency, and that the police did not make misrepresentations or deliberate falsehoods during the questioning.

The judge's subsidiary findings with regard to his determination that a waiver was knowing and voluntary will not be disturbed on appeal if the findings are warranted by the

---

[2] The judge suppressed the final statement which the defendant made at appoximately 3 A.M., after he asserted his right to counsel.

evidence. *Tavares, supra* at 144-145. *Commonwealth* v. *Santo,* 375 Mass. 299, 303 (1978). Furthermore, a trial judge's ultimate conclusion of a voluntary waiver is entitled to deference. *Tavares, supra* at 145. *Commonwealth* v. *White,* 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978). In performing our appellate function, however, we must make an independent determination as to the correctness of the judge's conclusion that a waiver was knowingly, voluntarily, and intelligently made in light of the facts as found by him. *Tavares, supra.* See *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977).[3]

The defendant was initially advised of his Miranda rights at approximately 12:05 A.M., at which time he waived them, and was not readvised of his rights until approximately 3 A.M. "We recognize that '*Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity.'" *Commonwealth* v. *Cruz,* 373 Mass. 676, 687 (1977), quoting *United States* v. *Hopkins,* 433 F.2d 1041, 1045 (5th Cir. 1970), cert. denied, 401 U.S. 1013 (1971). Nevertheless, in this case the judge permissibly concluded that, in light of all the circumstances, the lapse of time was not significant and did not negate the validity of the defendant's knowing, voluntary, and intelligent waiver.

There is ample evidence to support the judge's ruling. The defendant received the Miranda warnings and understood them. See *Commonwealth* v. *Williams,* 378 Mass. 217, 225 (1979). Further, the police attempted to ascertain whether the defendant wanted to waive his rights before they questioned him. See *id.* In each instance, the defendant answered affirmatively and chose to make a statement. His willingness to talk is evidence of waiver. See *id.* at 225-226. With regard to the statements made by the defendant to Police Chief Keene, since it was the defendant

---

[3] In *Commonwealth* v. *Day,* 387 Mass. 915, 921 (1983), we held that the Commonwealth must prove a knowing and intelligent waiver of Miranda rights *beyond a reasonable doubt.* That standard is not applicable here since it is to be applied only to decisions made on motions to suppress after the date of the *Day* opinion. *Id.* at 921 n.10.

who actively sought to speak with Keene, repetition of
Miranda warnings was not required. See *Commonwealth
v. Black,* 4 Mass. App. Ct. 512, 516 (1976). In addition, the
interviewing sessions do not reveal any excessive police pres-
sure or unfair tactics. See *Commonwealth* v. *Davis,* 380
Mass. 1, 6 (1980) ("interview [was] logical and orderly, free
of hostility, coercion, or threats"); *Commonwealth* v.
*Borodine,* 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049
(1977) ("questioning was fair, dignified, and restrained").
Nor was the defendant physically restrained in any way. See
*Commonwealth* v. *Cruz, supra* at 689. Indeed, Detective
Brugliera asked the defendant several times whether he
would like to speak to his parents, and the defendant in-
dicated repeatedly that he did not desire to do so. The cir-
cumstances support the judge's determination that the lapse
of time was not significant and that the defendant knowing-
ly, voluntarily, and intelligently waived his Miranda rights.
Cf. *Commonwealth* v. *Cruz, supra* at 687-689 (initial
Miranda warnings found sufficient to support a waiver of
approximately three and one-half hours); *Commonwealth*
v. *Valliere,* 366 Mass. 479, 484, 487 (1974) (initial Miranda
warnings found sufficient to support a waiver occurring
over two hours later).

2. The defendant also asserts that the judgment as to
murder should be reversed because the judge, in instructing
on the issue of felony-murder, gave no instruction that the
jury must find that the defendant acted with a conscious
disregard for human life. We disagree.

The felony-murder rule, defined by common law, is that
a homicide committed during the commission or attempted
commission of a felony is murder. *Commonwealth* v.
*Moran,* 387 Mass. 644, 648 (1982). In *Commonwealth* v.
*Matchett,* 386 Mass. 492, 502 (1982), we noted that "[t]he
effect of the felony-murder rule is to substitute the intent to
commit the underlying felony for the malice aforethought
required for murder." We also determined in *Matchett,*
however, that the use of the felony-murder rule was limited
by the principle that "criminal liability for causing a par-

ticular result is not justified in the absence of some culpable mental state in respect to that result." *Id.* at 507, quoting Gegan, Criminal Homicide in the Revised New York Penal Law, 12 N.Y.L.F. 565, 586 (1966). We concluded that "[a] felony-murder rule that punishes [as murder] all homicides committed in the perpetration of a felony whether the death is intentional, unintentional or accidental, without the necessity of proving the relation of the perpetrator's state of mind to the homicide, violates [this] most fundamental principle . . . ." *Matchett, supra* at 506-507. We therefore held in *Matchett* that, because the crime of extortion "may be committed in a way not inherently dangerous to human life," there could be no conviction for felony-murder where the underlying felony was extortion unless the jury found that the extortion involved circumstances demonstrating the defendant's conscious disregard of the risk to human life. *Id.* at 508.

In *Commonwealth* v. *Moran,* 387 Mass. 644, 650-651 (1982), we extended the holding of *Matchett* to cases where a felony-murder is based on the underlying felony of unarmed robbery. We concluded that since "[u]narmed robbery is not inherently dangerous to human life . . . [p]unishing as murder homicides that result from such crimes without proof of a culpable mental state with respect to the killing violates the *Matchett* principle." *Id.* at 651. Thus, we held that the felony-murder rule applies in cases where the underlying felony is unarmed robbery "only if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life." *Id.*

In this case the judge instructed the jury that "when a Defendant by some act done in the commission or attempted commission of some crime of the degree of a felony, causes the death of a human being, the killing is considered to be with malice aforethought and is murder and not merely manslaughter. The theory is that the intent to commit some other felony supplies, as a matter of law, the malice aforethought necessary to make a killing murder." If the *Matchett* rule were applied to this case, there would be error in

the charge, because the judge gave no instruction that the jury must find conscious disregard of risk to human life in order to apply the felony-murder rule.

Our basic consideration is whether we shall extend the *Matchett* principle to cases where the underlying felony is larceny of a motor vehicle under G. L. c. 266, § 28, or kidnapping under G. L. c. 265, § 26. We think it is clear that the crime of larceny of a motor vehicle need not be dangerous to life. The question is closer as to the crime of kidnapping, and we leave that issue to another day and another case. However, for the purposes of this appeal, we assume that the *Matchett* rule also applies to the crime of kidnapping. The further question is whether the *Matchett* rule should be applied retrospectively here. The defendant did not object to the judge's instructions on felony-murder. Since trial of this case was completed before *Matchett* or *Moran* was decided, the judge's charge was free of error when it was given. However, the defendant here relies upon language in *Moran*,[4] 387 Mass. at 651 n.3, where we specifically determined that our ruling in that case would apply to cases that were pending on direct appeal or as to which the time for direct appeal had not expired on the date of the *Moran* decision.

It is argued that this case clearly falls within the limited class of cases which, under *Moran,* is to be afforded retrospective application of the *Matchett* principle. Even if we accept that argument, a per se reversal of this case does not follow. We apply, rather, the miscarriage of justice standard of review.[5]

---

[4] In *Commonwealth* v. *Moran*, 387 Mass. 644 (1982), as in this case, the defendant had not objected to the felony-murder charge on *Matchett* grounds. He objected to this portion of the charge on constitutional grounds — an issue which we laid to rest in *Moran, supra* at 650 — but raised no other objection.

[5] Although the defendant's rights were not saved below, we review this issue under G. L. c. 278, § 33E, as appearing in St. 1979, c. 346, § 2, to determine whether relief should be afforded for any "reason that justice may require."

Measuring by that standard, we decline to reverse the conviction of murder in the second degree. It was shown, for the most part by the defendant's admissions to police, that the defendant entered the automobile without noticing that a woman was seated on the passenger's side of the front seat. Even if this unlikely claim were credited by the jury, it was also shown that the defendant had immediate opportunity to withdraw ("You're in the wrong car"). Nevertheless, he chose to drive away, and it can reasonably be inferred that the victim's life was then in danger from his knowledge that she was a potential identifying witness against him. He continued to drive after she told him that she suffered from high blood pressure and had just returned from the doctor's office. He had already driven into the property of the Paul A. Dever School, toward the place where he knew other burned vehicles were located, when the woman became unconscious. Although he stated that he tried to revive her by mouth-to-mouth resuscitation, he was not certain whether she was dead or alive when he placed her in the trunk of the car and then burned the vehicle.[6] Medical testimony showed that the victim was alive when the fire started and died as a result of the fire.

We conclude that, even without application of the felony-murder doctrine, the proof of malice was overwhelming, as established by the defendant's admissions, and that, appraised by the miscarriage of justice standard, he is not entitled to a reversal of the murder conviction based on retrospective application of the *Matchett-Moran* principle.

3. The defendant argues that the trial judge instructed the jury incorrectly by refusing to make an explicit reference to the specific facts on which he bases his defense. We disagree. Defense counsel requested that the judge, in instructing the jury on involuntary manslaughter, explain the issue of wanton and reckless conduct by referring to the defendant's belief as to whether the victim was dead or alive

---

[6] At trial he testified that he thought she was dead at this time.

when he placed her in the trunk. It is within the trial judge's discretion, however, to choose the form of expression best adapted to make the law intelligible to the jurors. *Commonwealth* v. *Cobb,* 379 Mass. 456, 467 (1980). Accordingly, the trial judge is not bound to instruct either "in the exact language of particular requests for instructions . . . [or] on every subsidiary fact and possible inference." *Commonwealth* v. *Chasson,* 383 Mass. 183, 188 (1981). See *Commonwealth* v. *Harris,* 376 Mass. 201, 208-209 (1978); *Commonwealth* v. *Therrien,* 371 Mass. 203, 206 (1976); *Commonwealth* v. *Edmonds,* 365 Mass. 496, 506 (1974). In this case, reading the instructions as a whole, we conclude that they were not misleading and that they fairly permitted the jury to consider the issue of involuntary manslaughter. See *Chasson, supra.*

4. The defendant also asserts that the judge erred in admitting evidence of other crimes. Evidence of prior criminal activity may be admitted to establish "knowledge, intent, motive, [and] method." *Commonwealth* v. *King,* 387 Mass. 464, 469 (1982), quoting *Commonwealth* v. *Imbruglia,* 377 Mass. 682, 695 (1979). "The test of admissibility is whether the relevance of the evidence outweighs its possible prejudicial effect." *Commonwealth* v. *Cefalo,* 381 Mass. 319, 336 (1980).

The defendant was charged, inter alia, with larceny of a motor vehicle. The defendant maintained that he only intended to take the vehicle for a "joy ride." Accordingly, the Commonwealth attempted to prove that the defendant possessed the necessary intent to commit larceny by introducing testimony indicating that the defendant had stolen other vehicles, taken them to the same location, and burned them. Specifically, the Commonwealth brought Dennis Nixon, a friend of the defendant, to the stand so that he would state, as he supposedly had in pretrial statements, that the defendant had told him that he had taken these other vehicles to the cart path area and burned them. Nixon, however, did not answer the prosecutor's questions as the prosecutor had represented to the judge that he would.

Rather, Nixon stated merely that the defendant had told him that the vehicles at the cart path area were stolen. Nixon stated further that the defendant had never told him that he had stolen the cars or that he had burned them. Nevertheless, the evidence that the defendant was aware that the destination to which he drove with the victim was a place where other stolen vehicles had been concealed and burned was relevant to the proof of his larcenous intent. Further, after it became evident that the testimony of the witness did not fulfil the expectations of the prosecutor as represented to the judge, there was no motion by the defense to strike the testimony. The admission of the evidence was within the judge's discretion.

5. We also reject the defendant's assertion that certain statements made by the prosecutor in his closing argument were improper. The defendant first argues that the prosecutor improperly analogized the defendant's carrying of the body of the victim from the passenger area to the trunk to carrying a live body or a baby. The purpose of the prosecutor's analogy was to refute the defendant's claim that he believed that the victim was dead when he placed her in the trunk. The prosecutor was attempting to demonstrate to the jury that the defendant must have felt the victim breathing, must have known she was alive.

We do not think the analogy was improper. We note that "[i]t is proper for counsel to use analogy, example and hypothesis as an aid to effective and aggressive argument." *Leone* v. *Doran,* 363 Mass. 1, 18, modified on other grounds, 363 Mass. 886 (1973). See also *Commonwealth* v. *Connolly,* 308 Mass. 481, 496 (1941). Furthermore, counsel may argue facts derived from the jurors' common knowledge and experience. *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 420 (1978). *Commonwealth* v. *McColl,* 375 Mass. 316, 323 (1978).

We also disagree with the defendant's assertion that the prosecutor improperly interjected his personal belief as to premeditation. it is clear that a prosecutor, in argument, may not express personal belief in the defendant's guilt or

comment on facts not in evidence. *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 537 (1971). In this case, however, the prosecutor's comment was preceded and followed by recounting the evidence at trial which supported an inference of premeditation. We emphasize that "[c]ounsel has the right to argue inferences from the evidence favorable to his case, and the precise form should not control unless it tends to lead the jury to an improper inference not from the evidence but from the apparent personal knowledge of the attorney." *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 315 (1973). In this case, no assertion of personal knowledge occurred.

Since the offenses here were committed before July 1, 1979 (see *Commonwealth* v. *Davis,* 380 Mass. 1, 15 [1980]), the defendant is entitled to, and we have accorded, the special review of G. L. c. 278, § 33E. No reason appears for reducing the murder conviction or granting a new trial.

*Judgments affirmed.*

O'CONNOR, J. (dissenting). The judge instructed the jury that, "when a Defendant, by some act done in the commission or attempted commission of some crime of the degree of a felony, causes the death of a human being, the killing is considered to be with malice aforethought and is murder and not merely manslaughter. The theory is that the intent to commit some other felony supplies, as a matter of law, the malice aforethought necessary to make a killing murder." The court acknowledges that "[i]f the *Matchett* rule were applied to this case, there would be error in the charge, because the judge gave no instruction that the jury must find conscious disregard of risk to human life in order to apply the felony-murder rule." *Supra* at 504-505. The court then assumes that *Commonwealth* v. *Matchett,* 386 Mass. 492 (1982), does apply. *Supra* at 505. Given that assumption, there was error in the jury instruction with

regard to felony-murder. However, applying a miscarriage of justice standard of review, the court declines to reverse the conviction of murder in the second degree.

For the purpose of this opinion, I accept the "miscarriage of justice" standard of review. However, measuring by that standard, I believe that the murder conviction should be reversed.

The court reasons that affirming the defendant's conviction does not risk a miscarriage of justice because, in its view, "even without application of the felony-murder doctrine, the proof of malice was overwhelming." *Supra* at 506. This statement is susceptible to several different interpretations. The court's rationale could be that, since the evidence of malice, unrelated to the felony-murder doctrine, was overwhelming: (1) the jury must have based its verdict on a finding of that type of malice (hereinafter "traditional malice"), so there is little risk that the verdict was influenced by the erroneous felony-murder instruction; (2) if the jury had addressed the question of traditional malice, they would have found it; (3) the court itself is satisfied that there was traditional malice; (4) if the correct instruction had been given, the jury would have found that the defendant consciously disregarded the risk to the victim's life, or (5) the court itself is satisfied that the defendant consciously disregarded the risk to the victim's life. None of these rationales support the court's decision to affirm the conviction.

The defendant's murder conviction should be affirmed only if the jury, applying correct principles of law, determined that the Commonwealth had proved every element of murder beyond a reasonable doubt. The court should not speculate as to whether the jury would have found traditional malice, or as to whether the jury would have found conscious disregard of risk to human life, if they had addressed those issues. Nor should the court substitute its judgment for that of the jury on questions of fact, and uphold the conviction because the court thinks the defendant is guilty. The only appropriate question for this court is

whether there is a substantial risk that the verdict was based on the erroneous felony-murder instruction. I believe that there is such a risk and that the conviction should not be affirmed.

It is just as likely that the verdict was based on an application of the felony-murder doctrine, as it is that the verdict was based on a finding of traditional malice. Even if the evidence of traditional malice was "overwhelming," as the court asserts, it was no more overwhelming than was the evidence that the defendant caused the victim's death in the commission of larceny of a motor vehicle or kidnapping. That the verdict was based on the felony-murder rule is suggested, at least, by the fact that the jury found the defendant guilty of murder in the second degree, not in the first degree. We cannot be sure how the jury arrived at their verdict, and this is the basis of my dissent, but, if the jury based their verdict on traditional malice, it is difficult to understand why they did not also find deliberate premeditation and return a verdict of murder in the first degree.

The Commonwealth's evidence of traditional malice was not overwhelming, when considered in conjunction with the defendant's testimony. The court correctly characterizes the defendant's testimony as basically a restatement of the information he had given to Officer Brugliera. *Supra* at 500. The defendant stated at trial that he became scared, began driving, panicked and, consequently, did not stop the vehicle. He further stated that the victim became unconscious, and he examined her pulse and did not believe that she was still breathing. He told the jury that he thought she was dead when he put her in the trunk. There is no indication that the jury rejected the defendant's testimony. If believed, the testimony would preclude a finding of traditional malice. Since the jury were not required to measure the defendant's credibility in order to find him guilty of murder under the judge's felony-murder instruction, since the jury found the defendant guilty of larceny of a motor vehicle and kidnapping, and since the jury concluded that the defendant caused the victim's death, it is more likely that the con-

viction was based on the erroneous felony-murder instruction than on the correct malice instruction. Because there is a substantial risk that the jury's verdict was based on the erroneous felony-murder instruction, the defendant's conviction of murder in the second degree should be reversed.